UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Cr. No. 17- *10292* |
| | ) | |
| V. | ) | Violations: |
| | ) | 18 U.S.C. § 1546(a) |
| JEAN LEONARD TEGANYA | ) | Fraud and Misuse of Visas, |
| | ) | Permits and Other Documents |
| | ) | |
| | ) | 18 U.S.C. § 1621(1) |
| | ) | Perjury |
| | ) | |
| | ) | 18 U.S.C. § 1621(2) |
| | ) | Perjury |

**INDICTMENT**

The Grand Jury charges that:

At all times relevant to this Indictment,

**I.    The Rwandan Genocide**

1.      Rwanda is one of the smallest countries in Central Africa, with approximately

seven million people, and is peopled by two main ethnic groups, the Hutu and the Tutsi.   The

Hutus account for 90 percent of the population.   Following Rwanda's independence from

Belgium in 1962, the Hutu majority gained control of the government, and engaged in acts,

including discrimination and acts of violence, against Tutsis.   As a result, numerous Tutsis fled

Rwanda and some formed a rebel guerilla army, known as the Rwandan Patriotic Front ("RPF").

2.      In or about the early 1990s, the RPF invaded Rwanda; thereafter, Hutu President

Juvenal Habyarimana executed agreements that mandated that the Hutus and Tutsis would share

power.   These agreements, which were negotiated between July 1992 and June 1993, were

1

signed in Arusha, Tanzania, and came to be known as the Arusha Accords.   Pursuant to the

Accords, Habyarimana's party, the Mouvement Revolutionaire National pour le Developpement

("MRND"), shared power with several other parties, as well as those that represented the RPF.

     3.     On or about April 6, 1994, the Rwandan president's plane, which was carrying

President Habyarimana and Burundi's new President, was shot down by ground-fired missiles as

it approached Rwanda's airport at Kigali.   This assassination precipitated a period of political

violence in Rwanda.   In particular, Hutu extremists, with positions of power in an interim

government formed after Habyarimana's assassination, began targeting and killing prominent

opposition figures, including moderate Hutu politicians and Tutsi leaders.   Included among

those killed were government ministers opposed to the extremists.

     4.     The killings spread throughout the countryside as Hutu soldiers, militia, including

the youth militia of the MRND, known as the Interahamwe, and civilians, armed with machetes,

clubs, guns and grenades, began killing Tutsi civilians.   All individuals in Rwanda carried

identification cards specifying their ethnic background, a practice left over from colonial days.

These identification cards, known as "cartes d'identite," or "identity cards," which included

information about the bearer, including ethnicity, now meant the difference between life and

death.   Roadblocks where identity cards were checked were set up all over the country and

Tutsis were attacked and killed wherever they congregated, including at hospitals, churches, and

schools.

     5.     The Hutu extremists engaged in genocidal mania, clubbing and hacking to death

defenseless Tutsi families with machetes everywhere they were found.   A Rwandan radio

station, controlled by Hutu extremists, further encouraged the killings by broadcasting non-stop

hate propaganda, and even pinpointed the locations of Tutsis in hiding.

6.      The killings only ended after armed Tutsi rebels of the RPF, invading from neighboring countries, managed to defeat the Hutu extremists and halt the genocide in July 1994. By then, over one-tenth of the population, an estimated 800,000 persons, had been killed.

7.      The prefecture of Butare, located in the south of Rwanda, was the intellectual and cultural center of Rwanda at the time of the genocide.   Butare had a high percentage of Tutsis as compared to the national average demographics and a strong moderate and multi-ethnic political presence. On or about April 19, 1994, the interim Rwandan government removed the Tutsi governor in Butare.   On or about April 20, 1994, the killings arrived in full force in Butare with the establishment of roadblocks and arrests by military patrols.   These measures resulted in several small-scale massacres and targeted killings.

8.      As the intellectual capital of Rwanda, Butare was the site of the national university to which the Butare University Hospital ("the Hospital") was attached.   Tutsi students were killed at the university in the early days of the genocide in Butare. The Hospital was itself the site of many atrocities.   Tutsi patients were removed from the Hospital upon verification of their ethnicity and then beaten or hacked to death behind the hospital.   Hospital nurses who were Tutsi were also killed.   Killings and other acts of violence at the Hospital aimed at Tutsis continued throughout the duration of the genocide.

## II.      The Defendant JEAN LEONARD TEGANYA

9.      The Defendant JEAN LEONARD TEGANYA ("TEGANYA") is from Gisenyi, a prefecture (or state) in northern Rwanda.   Many of the Hutu elite, including the assassinated president, were from the northern prefectures.

3

10. TEGANYA was a medical student and medical trainee at the Hospital before and during most of the genocide. He lived in a dormitory on the Hospital grounds.

11. Both before and during the genocide, TEGANYA was an active member of the MRND and its youth militia, the Interahamwe.

12. While at the Hospital during the genocide, TEGANYA played an active role in the persecution of Tutsis. For example, he assisted the Interahamwe and the military in the identification of Tutsis among Hospital patients and personnel; search for Tutsis hiding on the Hospital grounds; capture of Tutsis; and forcible removal of Tutsis from the Hospital and Hospital grounds.

### III. TEGANYA's Arrival In The United States And Application For Asylum

13. TEGANYA avoided border inspection and walked into the United States from Canada on or about August 3, 2014. TEGANYA was encountered by Customs and Border Protection officials near Houlton, Maine and was arrested for administrative immigration removal for entering the United States without being inspected.

14. TEGANYA applied for asylum on September 13, 2014, by submitting an Application for Asylum and Withholding of Removal, Form I-589 ("Asylum Application"). In response to the question on the Asylum Application, "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group or the press or media," TEGANYA responded as follows:

> My father was the local President (formerly Kibilira District) of
> MRND from 1991 to 1994. As a student, I belonged to the Red

4

Cross Youth Section from 1986 to 1991.   I was president of the
Red Cross Youth Section from 1989 to 1990.   I will submit a
detailed declaration prior to my asylum hearing.

15.     In an affidavit he submitted in support of the Asylum Application, TEGANYA

discussed his father's activities as an MRND member, but provided no information concerning

his own affiliation with the MRND, the Interahamwe, or any other militia group.

16.     TEGANYA signed the Asylum Application under the following certification:

I certify, under the penalty of perjury under the laws of the United
States of America that this application and the evidence submitted
with it are all true and correct.

**IV.     TEGANYA'S Immigration Court Bond Hearing**

17.     On September 16, 2014, TEGANYA testified under oath at a bond hearing

conducted by the Immigration Court.

18.     At that hearing, TEGANYA knowingly made false statements concerning his

MRND affiliation and what he observed during the Rwandan genocide.

5

<u>COUNT ONE</u>
18 U.S.C. § 1546(a)
Fraud and Misuse of Visas,
Permits and Other Documents

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment

and further charges that, on or about September 13, 2014, in the District of Massachusetts and

elsewhere, the defendant,

JEAN LEONARD TEGANYA,

did knowingly make under oath, and did knowingly subscribe as true under penalty of perjury

under 28 U.S.C. § 1746, a false statement with respect to a material fact in an application and

document required by the immigration laws and regulations prescribed thereunder, and did

knowingly present such application and document, which contained a false statement and which

failed to contain any reasonable basis in law and fact.    Specifically the defendant did knowingly

prepare, sign, and present a Form I-589, Application for Asylum and for Withholding of

Removal, knowing it contained the false statements described below:

> In response to a question that asked "Have you or your family members ever belonged to
> or been associated with any organizations or groups in your home country, such as, but not
> limited to, a political party, student group, labor union, religious organization, military.or
> paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group
> or the press or media," the defendant responded by indicating "Yes," and when instructed
> to "describe for each person the level of participation, any leadership or other positions
> held and the length of time you or your family members were involved in each organization
> or activity," the defendant stated as follows:
>
>> My father was the local President (formerly Kibilira District) of
>> MRND from 1991 to 1994.   As a student, I belonged to the Red
>> Cross Youth Section from 1986 to 1991.   I was president of the Red
>> Cross Youth Section from 1989 to 1990

As the defendant then and there well knew, that response set forth above was false, in that the

Defendant was himself a member of the MRND Party and the Interahamwe before and during the

6

genocide in Rwanda, which began in April 1994.

All in violation of Title 18, United States Code, Section 1546(a).

COUNT TWO
18 U.S.C. § 1621(2)
Perjury

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 13, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

in a declaration, certificate, verification, and statement under the penalty of perjury as permitted under 28 U.S.C. § 1746, did knowingly and willfully subscribe as true material matters which he did not then and there believe to be true, that is to say:

At the time and on the date stated above, on a Form I-589, Application for Asylum and for Withholding of Removal, the defendant responded to the question set forth below with the statement set forth below, which statement the defendant then and there knew was false.

> In response to a question that asked "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group or the press or media," the defendant responded by indicating "Yes," and when instructed to "describe for each person the level of participation, any leadership or other positions held and the length of time you or your family members were involved in each organization or activity, the defendant stated as follows:

>> My father was the local President (formerly Kibilira District) of MRND from 1991 to 1994. As a student, I belonged to the Red Cross Youth Section from 1986 to 1991. I was president of the Red Cross Youth Section from 1989 to 1990.

As the defendant then and there well knew, the response set forth above was false, in that the Defendant was himself a member of the MRND Party and the Interahamwe before and during the genocide in Rwanda, which began in April 1994.

8

The Defendant signed said Form I-589 and certified under penalty of perjury under the laws of the United States of America that the answers he provided on said Form I-589 were true and correct.

All in violation of Title 18, United States Code, Section 1621(2).

9

## COUNT THREE
Fraud and Misuse of Visas,
Permits and Other Documents
18 U.S.C. § 1546(a)

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 13, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

did knowingly make under oath, and did knowingly subscribe as true under penalty of perjury under 28 U.S.C. § 1746, a false statement with respect to a material fact in an application and document required by the immigration laws and regulations prescribed thereunder, and did knowingly present such application and document, which contained a false statement and which failed to contain any reasonable basis in law or fact.    Specifically the defendant did knowingly prepare, sign, and present a Form I-589, Application for Asylum and for Withholding of Removal, knowing it contained the false statements described below:

> In response to a question that asked "Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion," the defendant responded by indicating "No."

As the defendant then and there well knew, that response was false because the defendant personally ordered, incited, assisted and otherwise participated in causing harm and suffering to persons because of their membership in a particular social group, to wit Tutsis, during the genocide in Rwanda, which began in April 1994.

All in violation of Title 18, United States Code, Section 1546(a).

10

<u>COUNT FOUR</u>
18 U.S.C. § 1621(2)
Perjury

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 13, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

in a declaration, certificate, verification, and statement under the penalty of perjury as permitted under 28 U.S.C. § 1746, did knowingly and willfully subscribe as true material matters which he did not then and there believe to be true, that is to say:

At the time and on the date stated above, on a Form I-589, Application for Asylum and for Withholding of Removal, the defendant responded to the question set forth below with the statement set forth below, which statement the defendant then and there knew was false.

> In response to a question that asked "Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion," the defendant responded by indicating "No."

As the defendant then and there well knew, that response was false because the defendant personally ordered, incited, assisted and otherwise participated in causing harm and suffering to persons because of their membership in a particular social group, to wit Tutsis, during the genocide in Rwanda, which began in April 1994.

The Defendant signed said Form I-589 and certified under penalty of perjury under the laws of the United States of America that the answers he provided on said Form I-589 were true and correct.

All in violation of Title 18, United States Code, Section 1621(2).

11

COUNT FIVE
18 U.S.C. § 1621(1)
Perjury

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 16, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

having duly taken an oath before a competent tribunal, officer and person, in a case in which a law of the United States authorizes an oath to be administered, that he would testify, declare, depose and certify truly, did willfully and contrary to such oath state a material matter that he then and there did not believe to be true, that is to say:

At the time and place stated above, before an Immigration Judge, in an Immigration Court of the United States, an oath was administered to the defendant TEGANYA, who was appearing as a witness, that he would testify truthfully, during removal proceedings to consider whether he should be removed from the United States or granted asylum, pursuant to the laws and regulations of the United States.

At the time and place alleged, the defendant TEGANYA, appearing as a witness under oath at a proceeding before the Immigration Judge, knowingly made the following declarations in response to questions with respect to material matters as follows:

| | |
|---|---|
| Question: | And what happened to him [your father]? |
| Answer by TEGANYA: | My father was also a – was also the local head of – the local president of the MRND, which was the formal ruling party. |

\*       \*       \*

12

| | |
|---|---|
| Question: | Why are you afraid to go back to Rwanda? |
| Answer by TEGANYA: | I'm afraid because of this political past of my father.   Even though I'm not attached to him politically, I was not interested in his political activity or I don't – I have no political ambition.   I was not living with him.   <u>I never belong [sic] to that political party</u>, but still in Rwanda, many times it's about family. |

The declaration of defendant TEGANYA that is underscored above, as defendant TEGANYA then and there well knew and believed, was false in that defendant TEGANYA was a member of the MRND before and during the Rwandan genocide.

| | |
|---|---|
| Question: | What did you see at the hospital with respect to the genocide? |
| Answer by TEGANYA: | At the hospital, mostly what I saw, it was just people who were left of dead.   Just coming to the hospital seeking for medical care. |

*    *    *

| | |
|---|---|
| Question: | So, what exactly did you see when you were an intern at Butare hospital? |
| Answer: | As I was telling the – his honor, I mostly – what I saw, I saw people coming, wounded people, victims of genocide coming to the hospital looking for medical care. |
| Question: | So, there is documentary evidence that actually shows that people who came to that particular hospital – and this is in Bond Exhibit . . . 5 that people were, actually being turned over to be slaughtered by the military that was waiting outside. Did you witness any of that? |
| Answer: | <u>No.</u> |
| Queston: | It talks about the horror that went on in this hospital where you were an intern for two months at the height of the genocide and you didn't see any of this; is that correct? |

| Answer: | Only a lot of details – according to my opinion – which are not really accurate.  I'm not the first one to state that even there is a woman who participated in [unintelligible] this document.  He give me – she give me her testimony in Canada.  So, that just – all I can say is what I have seen. What is written down, I – I cannot – cannot confirm that. |
| Question: | So, you never saw any atrocities occur? |
| Answer: | As it is written in the – the document, most of atrocity occurred at nighttime. |
| Question: | Did you see any atrocities occur? |
| Answer: | <u>No.</u> |

The declaration of defendant TEGANYA that is underscored above, as defendant TEGANYA then and there well knew and believed, were false in that defendant TEGANYA observed atrocities at the Hospital during the genocide, including Tutsis being turned over to the military to be killed.

All in violation of Title 18, United States Code, Section 1621(1).

**A TRUE BILL**

FOREPERSON OF THE GRAND JURY

JOHN A. CAPIN
ALOKE S. CHAKRAVARTY
ASSISTANT UNITED STATES ATTORNEYS

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

DISTRICT OF MASSACHUSETTS
DATE AND TIME:  9/27/17 @ 11:42

15