UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
vs. ) Criminal Action
)
JEAN LEONARD TEGANYA, ) No. 17-10292-FDS
Defendant )
)
)
)

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 1

JURY IMPANELMENT

John Joseph Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, MA 02210

March 8, 2019
8:58 a.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

United States Attorney's Office, by GEORGE P. VARGHESE, ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

Federal Public Defender Office, by SCOTT LAUER, ESQ., and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

ALSO PRESENT:

Augustin Mutemberezi, Interpreter
Moses B. Rndasunikwa, Interpreter

PROCEEDINGS

THE CLERK: All rise. Thank you. Please be seated. Court is now in session in the matter of United States vs. Jean Leonard Teganya, Criminal Action Number 17-10292.

Would counsel please identify themselves for the record.

MR. VARGHESE: Good morning, your Honor, George Varghese for the United States.

THE COURT: Good morning.

09:03AM MR. GARLAND: Scott Garland on behalf of the United States.

MR. LAUER: Good morning, your Honor, Scott Lauer from the Federal Defender's Office on behalf of Mr. Teganya.

MR. WATKINS: And Tim Watkins on behalf of Mr. Teganya.

THE COURT: All right. Good morning. We have brought in how many people?

THE CLERK: At seven-thirty, quarter of eight, it was about 80 so far.

09:03AM THE COURT: What we're going to do is fill the courtroom. We may have some people who stayed downstairs, but we're going to fill the courtroom, including the jury box, and I expect that, as usual, you know, people will melt away, particularly when they find out the length of the trial.

What, if anything, do we have to talk about? I did

receive and read counsel's proposed description of the case, I've tweaked my description somewhat, taking into account those suggestions. Is there anything else we need to talk about, anything from the government?

MR. GARLAND: I don't think so, nothing from the government, your Honor.

MR. LAUER: I did file an additional motion in limine last night.

THE COURT: Okay. I haven't seen that.

09:04AM MR. LAUER: The government may not have had time to review it.

THE COURT: Is there anything I need to deal with today?

MR. LAUER: No. It does relate, I think, to one of the government's first witnesses, but I don't think we need to deal with it immediately.

THE COURT: Okay.

MR. GARLAND: Your Honor, actually we would prefer to deal with it because it may change how the opening goes because

09:05AM there's some testimony that they want to exclude, and I may want to reference it during the opening. I've had a chance to look at it, and I'm prepared to argue that as well.

THE COURT: Okay. Let's do this. I need to read this, I think, so one way or another, we'll do that before the opening. Hopefully, we'll squeeze it in today. Let me take a

quick look at it.

MR. GARLAND: Your Honor, there is one thing I can say about the motion that may aid the Court.

THE COURT: Yes.

MR. GARLAND: The government is not disputing that some of what the defense is alleging we would have Dr. Zachariah testify to are the things that we would have him testify to.

THE COURT: Okay. I think I need to look at the photographs, but, Mr. Garland, why don't you at least respond.

09:06AM

MR. GARLAND: Would your Honor like to look at the photographs before I respond?

THE COURT: Why don't you go ahead.

MR. GARLAND: Okay. So Dr. Zachariah was a member of Doctors Without Borders. He was at the hospital before the genocide started, as the genocide started, and once the genocide came from the surrounding areas throughout the country, which he viewed and came to the University Hospital at Butare, things became so bad that he and his group left, even though their job was basically to be in war zones. It was that dangerous, so the reason that the testimony is relevant is there's apparently no dispute that Dr. Zachariah should be able to testify to what he saw at the hospital.

09:07AM

What I understand the defense to be saying is that we should exclude his observations of what happened outside the

hospital in the days leading up and then as he left the hospital.

The reason those are relevant are really couple fold. One is that in Count 5, Mr. Teganya said during his detainer hearing, his custody hearing, that he never saw any atrocities, that they all happened at night.

That suggests that the killing that was going on was all clandestine, that there were no signs for anybody to pick up on, that there had been killings, and that there was the 09:08AM evidence of the killings in sight, and the evidence will be, of course, that that is not true.

The fact that genocide was happening and killings were happening throughout the air surrounding areas, not far from Butare, and then closing in on that, and that evidence was left behind, like those piles of bodies suggests, and I think will help prove that the entire Interahamwe, the Hutus, the soldiers were not trying to cover this up.

In fact, what they were doing was leaving markers there so that people understood what was going to happen and 09:08AM the fact that this needed to keep going on, so what was going on in the countryside was exactly what happened in the hospital as well.

As far as the photographs are concerned, the photographs, part of the evidence that will come in is that at the hospital grounds or actually right behind the hospital

grounds and near to Mr. Teganya's dormitory where he was staying was a pit, really more of a depression. That's where Hutus would take people from the hospital, they would march them down there, and they would often beat them and kill them and then leave the bodies right there.

We don't have contemporary pictures of what that site looked like, but we do have those photos of what was going on at those piles of bodies that we're talking about by Dr. Zachariah and past testimony and will be talked about in

09:09AM this court as well.

This allows the jury to understand what that looks like, and a little bit of this sort of evidence helps to really bring it home to the jury what was going on, especially in light of the fact that most of the jury here has never been probably in a war zone, certainly not a war zone or a killing zone that leaves this sort of evidence.

The evidence of the body in the river as well, that is I believe a picture that Dr. Zachariah took one of a number, but we've asked to only have one of them. He took that as his

09:10AM group was fleeing from Butare to the border, and that is relevant as well that not only were there bodies being left on fields, there were so many that there were bodies going through rivers.

I think that he will testify that he actually timed how many bodies were there or the frequency by which they were

floating by and that there was one every 12 seconds. And those are all relevant to the charges that are against Mr. Teganya that he supposedly saw no atrocities whatsoever.

I believe that this will be the only visual evidence of this type. There is a club that we will introduce as well as an exhibit, and that will be the sort of weapon that the people used, but that's not a club with blood on it or anything like that, so this is fairly limited, and part of what we did was to take photos at least for the body piles that were kind

09:11AM of a soft focus from a distance, so I think that's the basic argument why all this is relevant.

THE COURT: Okay. Mr. Lauer.

MR. LAUER: Your Honor, what is at issue in this case is not what took place near the Burundian border, 120 kilometers from Butare and from the University Hospital where Mr. Teganya was.

The government's argument that he made a statement that he had not seen personally atrocities occurring and that that was a lie, that is at issue, but it is in the context of

09:11AM him being in Butare, the City of Butare at the hospital. It is not about what happened in the countryside. There is no allegation Mr. Teganya was in the countryside. There was no allegation he was at a river on the Burundian border, which is where that photograph was taken.

The photographs are graphic, they're clearly designed

to elicit and appeal to the jury's emotions. It's inflammatory. It has very little probative value and high risk of prejudice. It should be excluded.

Dr. Zachariah has testified a great many times, and the government has those transcripts, I have those transcripts. He essentially has a diary of the genocide enveloping the country, and his experiences going through checkpoints, seeing people hassled, seeing people killed.

Certainly he can testify as to his observations at the 09:12AM hospital and the facts and circumstances on the ground in Butare because that is what this case is about. It is not about what happened in the countryside, it is not about what happened at the Burundian border.

THE COURT: Do you want to respond, Mr. Garland?

MR. GARLAND: Your Honor, to curb that testimony will essentially basically say to the jury there is something out there called war, now let's zoom in at the hospital, and that needs some context because I think most of us would imagine that a genocide would not be perpetrated at a hospital, a place 09:13AM of healing, and they need some context about how that happened.

In fact, some of the events that occurred outside of the hospital that Mr. Zachariah or Dr. Zachariah will testify about inform how it is that he interpreted the events that were going on at the hospital because they're consistent with what he was seeing outside as the genocide made its way to Butare

because one of the things that is salient about this set of events is that the genocide did come late to Butare, it didn't come at the same time as it came to Kigali, which was to the north. It sort of made its way southward, and all of this will help the jury understand that what people say happened at this hospital actually did happen because what was going on in the countryside, and the ferocity with which it was happening outside of the hospital will help them understand the ferocity with which it went inside the hospital as well.

09:14AM As well, there are some events that Dr. Zachariah will talk about that did not occur at the hospital but did occur to hospital personnel, nurses, for example, who worked and other medical personnel who worked at the hospital but didn't live at the hospital and were killed or separated as well and one group told to kill the other.

That seems to be part and parcel of what happened at the hospital as well and how we understood what was going on at the hospital, and, again, all of that is relevant to help the jury understand how this claim that Mr. Teganya saw no 09:15AM atrocities, even though they were going on around the countryside and then overwhelmed the hospital is just fabulous and incredible.

THE COURT: All right. I'm going to think about this, and I'll give my decision in time for you, for both your opening statements, you will have time to respond and react.

MR. GARLAND: Thank you, your Honor.

THE COURT: Anything else?

MR. GARLAND: Not for the government, your Honor.

MR. LAUER: No, your Honor.

THE COURT: Hopefully, at some point after 9:30, we'll have all the people ready, and we'll get started.

THE CLERK: All rise.

(A recess was taken.)

THE CLERK: All rise.

09:48AM THE COURT: All right. Good morning, ladies and gentlemen. My name is Dennis Saylor, and I'm the Judge assigned to preside over this session of the United States District Court for the District of Massachusetts.

Let me start off by telling you what kind of case this is. This is a criminal case or criminal prosecution. There is one defendant, Jean Leonard Teganya. He's here in the jury room with his counsel. He's charged with two counts of making a false statement in an immigration document and three counts of perjury.

09:48AM Those of you who are chosen as jurors will be told later what the precise charges are and what the government has to prove beyond a reasonable doubt in order for you to convict the defendant, but to in order to make sure you understand the basic nature of the case, I'm going to give you sort of a summary or thumbnail sketch of what the charges are.

This case concerns in part events in Rwanda. Rwanda is a small country in East Central Africa. It has two principal ethnic groups, Hutu and Tutsi. Twenty-five years ago during a short period in April and July, 1994, there was a mass killing of Tutsi people in a period of about 100 days. At least a half a million people were killed. That event or those series of events have come to be known as the Rwanda genocide.

The defendant, Mr. Teganya, is a Rwandan National. In 2014, he entered the United States and applied for asylum. 09:49AM That's a form of immigration status that permits a person to stay in the country based on a threat to that person or a need for protection. He filled out a form, an application for asylum, and later he testified at a hearing before a Federal Immigration Judge.

The government charges that he made false statements on the form and that he committed perjury at that immigration hearing. The government alleges that in 1994, while living in Rwanda, Mr. Teganya belonged to a political party that advocated mass violence. It alleges that he participated in 09:50AM numerous acts of violence in Rwanda in 1994, and it alleges that he lied about those matters when applying for asylum at the immigration hearing.

So that's what this case is about basically. The government has charged that the defendant made false statements on his application for asylum and committed perjury at his

immigration hearing concerning his role or his status concerning events in Rwanda in 1994. Again, that's just a summary of the charges. The indictment is simply an accusation. He has pleaded not guilty to the charges. He's presumed innocent, and the government must prove his guilt beyond a reasonable doubt.

The next topic I want to talk to you about is the length of the trial. I'm sure many of you are curious or even nervous about the possible commitment of time. This, I think, is going to be a relatively interesting trial, but it's not going to be a very short trial.

The lawyers expect that this case is going to take four or five weeks or possibly six weeks from beginning to end. Four weeks will take us to about April 5th, and five weeks to April 12th. I expect that the jury will get the case in early or mid-April.

I understand that jury service can be burdensome, and I certainly understand the impact that this is likely to have on your lives. I'm going to do everything I can to make sure this case moves along as rapidly as it can under the circumstances consistent with a fair trial and that the lawyers are held within reason to the time that we've set aside.

I'm going to do what I can to make sure we start precisely on time and we stick our schedule. I can control lots of things, I can't quite control everything. This case is

going to be a little less predictable than usual partly because most of the witnesses are coming from Africa or Europe or Canada, and they have international travel schedules, and they may require interpreters, and all of those are things that may affect the trial schedule, but I will do my best to manage all that, and I certainly understand the commitment we're asking of you.

Our normal trial day will be from 9:00 in the morning until 1:00 in the afternoon with a break at 11:00. You might 09:52AM wonder why we do it that way rather than going all day and trying to get the case over with sooner. Well, there are a lot of reasons for that. One of them is that the jurors find it difficult to sit all day. It's tiring, it's hard to concentrate for long periods, it's more disruptive to jurors, to their lives and to their jobs.

Sometimes jurors get caught in the afternoon commute if we go too long, and it's harder on the lawyers and the witnesses, and one of the things that we've discovered is the cases don't really move any faster when we try to sit all day.

09:53AM Unfortunately, I am going to require occasionally an afternoon session to make sure we stay on track and partly because of this business of having witnesses with international travel schedules and coming from overseas, and we're going to have an afternoon session next Tuesday, this coming Tuesday, which I think is March 12th.

I won't do anything like that without letting you know in advance. You can plan your lives accordingly, and I'll repeat all of this to those of who you are chosen as jurors again to make sure you understand exactly what the schedule is, but that's what this case is about. That's the length of time that we expect the trial will take.

I think you've already seen a video, and you probably already just this morning heard a lot about the importance of jury service, but I'm going to add my own thoughts.

09:54AM The jury system goes back at least 800 years to England at the time of the Middle Ages. Obviously, a great deal has changed in the world since then, but the basic idea is essentially the same. No person can be convicted of a serious crime except upon the unanimous vote of a jury made up of ordinary citizens. The founders of our nation believed that the right to a jury was so important that they put it in the Constitution and the Bill of Rights.

Jurors have always been composed of ordinary citizens taken from all walks of life, each of who brings his or her 09:54AM experience and perspective to the table. You don't have to have any particular education or life experience, but what is truly important is that you take your responsibilities certainly and that you exercise your authority to the best of your ability. The quality of the justice in the United States depends on the good judgment and common sense of ordinary

citizens.

It is a great system; it is not a perfect system. Nothing created by human beings will ever be perfect, but it is a great system, nonetheless. Trial by jury is not necessarily the most efficient way to decide things, and there are many things about it that are old-fashioned, but there are things that are more important than efficiency, and protection of our rights is one of those things.

We enjoy a great many rights and freedoms in this 09:55AM country. All of us take them from granted from time to time. Sometimes we have to be reminded what those rights are, why they're important.

The jury is one of the most basic protectors of our freedom. It is fundamental to our system of justice. It is both an obligation of citizenship and an honor and a privilege to serve, and if you are selected to serve, I hope you will exercise your duties responsibly and solemnly and in accordance with the law.

Again, I understand that this is probably not your 09:56AM first choice of how to spend the next few weeks. Unfortunately, there always are a few people who view this as a game and the goal of the game is to get out of jury service.

Again, it's a duty, it's like paying taxes or serving in the military. It's one of the prices that we pay for living in a free and democratic society that respects civil rights and

human rights. It's a price we pay for having a system of justice, and, again, our system of justice depends on the willingness of citizens to serve and the exercise of their good sense when they do serve.

You should not assume that your service will be burdensome. Many jurors find even if they're reluctant at the beginning that it turns out to be one of the most interesting and rewarding experiences of their lives.

Let me talk next about how we're going to select a
09:57AM jury. The parties in this case, both sides, have a right to a jury that's fair and impartial, one that is not biased or prejudiced one way or the other.

In order to try to obtain a fair jury, we have a selection process that we go through. I'll start by having the lawyers and Mr. Teganya be introduced to see whether any of you know them or have a connection with them. I'll list the possible witnesses, again, to see, if any of you know them or have a connection, and then I'm going to ask other questions on other topics.

09:57AM The purpose of those questions is to determine whether or not any of you should be excused for what we call cause. Once we've gone through that whole process and we've eliminated anyone who cannot or should not serve on the jury for one reason or another, we're going to call a group of people up into the jury box, which should by then be vacant, and by law,

the parties will have an opportunity to challenge a number of those prospective jurors. Those are what we call peremptory challenges where the parties don't have to give a reason. When the parties are both satisfied with the jury or they've run out of their challenges, the people who remain will be the jury.

We're going to impanel four alternates, that is, we're going to impanel 16 people, the 12 jurors who will decide the case, and four alternates in case something happens to jurors in the course of the trial.

09:58AM If you're not chosen to sit on the jury, you should not think it reflects upon you personally or your ability to be a good juror or a good citizen. This is not a scientific process. It's not a merit selection process, and you should not be in the least concerned if for some reason you're not chosen or you're struck.

All right. As I said, I'm going to start by asking you all some questions. Your answers must be oath. In other words, you must swear that your answers are true. It's very important that you give truthful responses, so I'll begin by 09:59AM asking the deputy clerk, Ms. Pezzarossi, to please swear in the jury pool.

(Jurors were sworn)

THE CLERK: Thank you. You may be seated.

THE COURT: All right. When I ask a question, if your answer is yes or you think your answer might be yes, please

raise your hand. If you raise your hand, I'll ask you to come over to the sidebar here one-by-one. I'll find out what the issue is, and I'll maybe explore it a little bit with you. I might excuse you or I might not.

For some of my questions, I expect more than one of you are going to raise your hand, and when that happens, I want you to line up in an orderly fashion here just inside the entrance to the enclosure, and I'll take you one at a time.

When you come over to sidebar, I'm going to be here, 10:00AM the stenographer is going to be there, the lawyers will be here, and I'd like you to stand this way so I can see you and hear you and the stenographer can pick up what you say.

Please don't be shy. Please don't hesitate to raise your hand if you're not sure what to do. The time to ask questions or to raise issues is now, not partway through the trial, and I will not be upset if you raise your hand because you weren't sure what to do.

All right. Again, this is a criminal case. There's one defendant, Mr. Teganya, who is here in the courtroom with 10:00AM his counsel. Again, he's charged with making false statements in an immigration document and with perjury, matters that relate at least in part to events in Rwanda in 1994, and at this point, I'll ask counsel to introduce themselves beginning with the government.

MR. VARGHESE: Good morning. My name is

George Varghese, and I represent the United States of America.

MR. GARLAND: Good morning, my name is Scott Garland, and I, too, represent the U.S.

MR. LAUER: Good morning, everyone. My name is Scott Lauer, I'm an attorney, I have an office in Boston. I represent Jean Leonard Teganya.

MR. WATKINS: Good morning, jurors. My name is Tim Watkins. I'm also an attorney here in Boston, and I'm also assisting in representing Mr. Teganya.

10:01AM THE DEFENDANT: Good morning. My name is Jean Leonard Teganya. I'm the defendant.

THE COURT: All right. Thank you. All right. Again, George Varghese and Scott Garland are Assistant United States Attorneys, the prosecutors in this case. They represent the government. Scott Lauer and Timothy Watkins represent Mr. Teganya.

Do any of you know or are you related to or acquainted with the defendant, Mr. Teganya?

To your knowledge, are any family members or close

10:01AM friends related to or acquainted with Mr. Teganya? All right. I see no hands.

Do any of you know or are you related to or acquainted with any of the lawyers in this case, Mr. Varghese, Mr. Garland, Mr. Lauer or Mr. Watkins?

Oh, there's a hand. Let me see you at sidebar.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: I'm sorry, could you identify your name and number if you know it.

THE JUROR: Juror Number 38.

THE COURT: Mr. Baillet.

THE JUROR: That's right. So I believe it was yesterday or the day before, I left a voice mail for Attorney Lauer.

THE COURT: Okay.

10:01AM THE JUROR: I didn't eventually take up the client, but there was a video arraignment involving a person Mr. Lauer represented. I initially was going to take the case as a public defender at CPCS. I know him and where he worked but other than that, I do not know him.

THE COURT: Is there anything about that connection or relationship that would affect your ability to serve as a fair juror in the trial of this case?

THE JUROR: I don't think so. I haven't seen him or spoken to him.

10:01AM THE COURT: At the risk of telling you something you don't need to be told, the fact, of course, that Mr. Teganya is represented by the federal defender has no bearing whatsoever on his guilt or innocence, and is there any way that that would affect your ability to serve knowing that fact?

THE JUROR: I don't think so.

THE COURT: All right. Any follow-up? Okay. Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: All right. Ladies and gentlemen, I asked whether any of you directly knew any of the lawyers. To your knowledge, is any member of your family or any close friend related to or acquainted with any of the lawyers? I see no hands.

Have you or any member of your family or any close friends ever worked with the United States Attorney's Office or had any dealings with them? All right. I see no hands.

10:02AM

All right. I'm going to read a list of people who may be called as witnesses in this case. I don't know whether all of these people will actually be called, but I've asked the lawyers to give me a name -- I'm sorry, there's a hand. Okay. Let me see you at sidebar.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: What's your name and number?

THE JUROR: Jennifer Brady.

10:03AM

THE COURT: Number 62. Okay, yes.

THE JUROR: So my husband is a police lieutenant in Dennis.

THE COURT: Okay. And do you know does he work on any federal task force or anything like that?

THE JUROR: He did, yeah, with the DEA.

THE COURT: With the DEA. Okay. Is he still on the task force?

THE JUROR: Not right now.

THE COURT: He's a lieutenant?

THE JUROR: He's a lieutenant in Dennis, yeah, but he did.

THE COURT: And is there anything about that connection or relationship that would affect your ability to be a fair juror in the trial of this case?

10:04AM THE JUROR: No.

THE COURT: Do you have any other connections to law enforcement, as long as I have here?

THE JUROR: I was a reserve officer in Dennis a few years back.

THE COURT: You, yourself, were?

THE JUROR: Yes.

THE COURT: The same question, anything about that that would affect your ability to be fair?

THE JUROR: No.

10:04AM THE COURT: You live in Osterville; is that right?

THE JUROR: Yes.

THE COURT: That's absolutely a long way to go or to come, and is there anything about that, you know, given the trial schedule or whatever that you want to raise with me?

THE JUROR: I'm due for surgery on the 19th, that's

the only thing, I'll be out of work.

THE COURT: On March 19th?

THE JUROR: Yeah.

THE COURT: You don't need to tell me the details, but is it major surgery?

THE JUROR: Yeah, it's a good knee surgery.

THE COURT: All right. I think probably I need to let you go then. That doesn't sound like something we can put off for a couple months.

10:04AM THE JUROR: Right.

THE COURT: Thank you. I'll let you go.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: All right. Again, I'm going to read a list of witnesses. I've asked the lawyers to give me a list of potential witnesses, anyone whose name might come up in the trial. Please listen carefully.

I'm going to do this in two parts. The first part is I'm going to list witnesses who are from the United States, and the second part I'm going to list witnesses who I think are 10:05AM from Africa or Europe. I'm not going to spell all the names. There's a lot of African names, but if you think there's any chance you might know that person or whatever, raise your hand, and we can explore it, okay. Just to save time, I'm not going to spell every one of these names.

Let me start with what I understand are the American

witnesses: Thomas Andersen, who works at Homeland Security Investigations in Boston; Meghann Boyle from U.S. Citizenship and Immigration Services in Boston; Kevin Cronin from Homeland Security Investigations in Boston; Xavier Kayigire, K-a-y-i-g-i-r-e, who lives in Aurora, Colorado; Jean Paul Mihigo, M-i-h-i-g-o, from Dayton, Ohio; Marcel Munyanziza, M-u-n-y-a-n-z-i-z-a, from Mine Hill, New Jersey; Eric Mshimiye, M-s-h-i-m-i-y-e, from Union Time, Ohio; Russell Radatz, R-a-d-a-t-z, from Customs and Border Protection in El Paso, 10:06AM Texas; Jeffrey Stillings from Homeland Security Investigations in Springfield, Massachusetts.

Do any of you know or have any connection in any way with any of those witnesses? All right. I see a hand in the back. I'll see you.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: What's your name and number?

THE JUROR: Nicholas Hatheway, Number 68.

THE COURT: All right. Mr. Hathaway, yes, sir.

THE JUROR: Possibly a Kevin Cronin.

10:07AM THE COURT: Okay. Remind me, who is Ken Cronin?

THE JUROR: Homeland Security.

MR. GARLAND: Homeland Security, okay.

THE JUROR: I'm not sure how you confirm that, I'm sure there's a few of them.

THE COURT: The Kevin Cronin that you know, tell me

about him.

THE JUROR: I was very good friends with his cousin. They're from Newburyport, he used to be on the DEA, if that helps.

THE COURT: Does that sound like the right person?

MR. VARGHESE: I don't think so.

THE JUROR: He's about my age, 48.

MR. GARLAND: That is about the age.

THE COURT: But as far as you're aware, this Kevin

10:08AM Cronin did not work on the DEA and was not from --

MR. GARLAND: Not that we know of. It's possible he could have been on the task force.

THE COURT: This is someone you know the cousin, right?

THE JUROR: Yes, I'm good friends with his cousin.

THE COURT: All right.

THE JUROR: We hung out a few times.

THE COURT: Okay. All right. It doesn't sound like this is the right Kevin Cronin. I'll ask the government to try

10:08AM to check on one of the breaks just to confirm that.

MR. VARGHESE: Yes, sir.

THE JUROR: I couldn't confirm without seeing him myself either.

THE COURT: Okay. In the meantime, I'm going to leave you in the pool.

THE JUROR: Sure.

THE COURT: Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: All right. Now with your insurance patience, again, I'm going to read a list of largely African names, if there's any doubt at all about whether you think you might know any of these people, all of whom appear to be living in foreign countries, please raise your hand: Jerome Arusha, Rwanda, Achille Bagosora, France; Jean Pierre Baligira, 10:09AM Burundi; Fidele Barinda, Rwanda; Jean Baptiste Bizimana, Burundi; Jean Pierre Gasasira, Rwanda; Charles Gashirabake, Burundi; Innocent Habimana, Rwanda; Jean Francois Habimana from Laval, Canada; Fidele Habyarimana from France; Jean Claude Kabagema from the Netherlands; Tharcisse Kabalisa, Rwanda; Bernard Kalimba, Rwanda; Stanislas Kurazikubone, Austria; Francois Legare from the Canada Border Services Agency in Canada; Jean Marie Mbonyinshuti, France; Albert Minani, Burundi; Augustin Minani, Austria; Etienne Minani, Burundi; Jean Pierre Muhimana from the Central African Republic; Esperance Mukamurenzi from Rwanda; Isabelle Mukankusi, Rwanda; Consolee Mukeshimana, Rwanda; Martin Mukeshimana, South Africa; Andre' Munonoka, South Africa; Jacques Munyazikwiye, Belgium; Musana, Rwanda; Michel Musilikare, Burundi; Callixte Ndagije Cyrene Musana, Rwanda; Jean Paul Munyentwari, Rwanda; Ernest Muvunandinda, Liberia; Tatiana Murebwayire Nahimana,

Burundi; Thomas Nahimana, France; Jean Bosco Ndikubwimana, Quebec, Canada; Cyprien Mugaba Ngabo, Cameroon; Assumpta Numukobwa, Rwanda; Diogene Nsengumuremyi, Rwanda; Anselme Ntawuyiruta, Burundi; Anicet Nzabonimpa, Rwanda; Emile Nzoyisaba, Burundi; Jean Pierre Rukebesha, Calgary, Canada; Ignance Rukeribuga, The Netherlands; Amiable Rwabukumba, France; Marcel Rwabukamba, Rwanda; Constance Rwariye, Burundi; Spiridion Seminega, Rwanda; Dr. Rony Zachariah of the World Health Organization, Geneva, Switzerland.

Do any of you know or recognize any of those names or have any reason to believe you have a connection to them? All right. I see no hands.

I omitted one name, someone who lives in the United States who's from Boston, Noel Twagiramungu from Boston, Massachusetts. Any connection to him?

All right. Do any of you have any physical problem or other kind of disability that would make serving as a member of the jury difficult or impossible or might interfere with your service as a juror? All right. I'll see you.

10:12AM

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: What's your number?

THE JUROR: 23.

THE COURT: What's your name?

THE JUROR: Mary Alves.

THE COURT: Yes.

THE JUROR: So I'm not sure really, but I'm 17 weeks pregnant.

THE COURT: I'm sorry.

THE JUROR: I'm 17 weeks pregnant, and I'm not sure I can get the prenatal care required for the next five or six weeks.

THE COURT: Okay. I assume you have some routine appointments set up during that period?

10:13AM THE JUROR: I do.

THE COURT: I don't know if this counts as good news or not, but usually medical officers are pretty helpful in terms of rescheduling things like this that are routine, you know, not emergent care, and so if you have an appointment during the time when we're expected to sit, let us know, and usually we can make one call and doctors are pretty good about it.

THE JUROR: Okay.

THE COURT: And that, of course, includes giving you
10:14AM time to get there and so on.

THE JUROR: Yes.

THE COURT: Obviously, pregnancies may present other issues, being nauseated, having to go to the bathroom, et cetera. If you wind up on the jury, I need to take my cues from you, in other words, if you have an issue, you've got to

tell me. One of the reasons we impanel for alternates is things happen.

THE JUROR: Yes.

THE COURT: If you wind up on the jury and it looks like you can't really do it, we have some flexibility.

THE JUROR: Okay.

THE COURT: I'm going to leave you on for now.

THE JUROR: That's fine, I just wanted to make you aware.

10:14AM THE COURT: Absolutely, that's a fair thing, and hopefully this won't go all the way to your term.

THE JUROR: I hope not.

THE COURT: But, again, it's just don't suffer in silence, if you've got an issue of any kind, you know, whether it's medical or whatever, let me know.

THE JUROR: Thank you very much.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: I thought there were two people. Again, if you'd all please line up and wait, it helps make everything go faster. Thanks.

10:15AM (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: What's your name and number? Number 33, Mr. Dagastino.

THE JUROR: I don't think I can make it here every day. I have no license, my mother is my only ride, and she has

lupus.

THE COURT: You have no driver's license?

THE JUROR: No.

THE COURT: And how did you get here today?

THE JUROR: My mother. She has lupus.

THE COURT: Okay. Can I get you to just step away out of earshot and talk to the lawyers real quick.

THE JUROR: Yeah.

THE COURT: Do you want me to explore this or just let him go?

10:15AM

MR. VARGHESE: Just let him go.

MR. WATKINS: Yes.

THE COURT: We're going to let you go.

THE JUROR: Thank you.

THE COURT: Next. Hi, what's your name and number?

THE JUROR: Number 6.

THE COURT: Number 6, Ms. Ferzoco.

THE JUROR: Yes. I just want you to be aware I'm diabetic.

10:16AM

THE COURT: Type I?

THE JUROR: Type 1, if I need to do any testing or treatment, I don't know, I just want to put it out there.

THE COURT: I'm glad you told me. Basically I need you to tell me if you have a problem. My father was diabetic, I'm very much aware of the issues, but whatever they might be,

you know, insulin, blood sugar, all the other things that come with it, let me know, don't suffer in silence, okay. If you wind up on the jury and for some reason you have a medical issue that forces you off, that's why we have four alternates, in other words, to have a little bit of flexibility, but I'm going to rely on you to raise an issue if you have one.

THE JUROR: I just wanted to let you know.

THE COURT: I appreciate that, and we'll deal with it the best we can. Thank you so much.

10:17AM THE JUROR: You're welcome.

THE COURT: Next.

THE JUROR: Hi, Peter Peterson.

THE COURT: Peter Peterson, Number 53.

THE JUROR: Yes.

THE COURT: All right. Yes, sir.

THE JUROR: Okay. This is more of a physical issue.

THE COURT: You have to keep your voice down.

THE JUROR: I have a very active bladder, and I don't take any medication for it, but I do take some supplements, but 10:17AM when I'm under stress and nervous, I have to go. I actually have to go right now.

THE COURT: Can you make it -- we have to stop everything. Do you need to go right this second?

THE JUROR: I do, but I mean I can continue right here. I know I have to go again.

THE COURT: All right. Let's do this. I'm going to leave you in the pool. If you wind up on the jury and you need to go to the bathroom, just raise your hand, and we'll take care of it. We have a lot bigger problems than that sometimes.

THE JUROR: I was wondering if that was going to be an issue because I know I would have to excuse myself a lot.

THE COURT: No, you're talking to a middle-aged or elderly man. I'm sympathetic here.

THE JUROR: Just turned 60.

10:18AM THE COURT: You're a young man then. I'm going to ask you to take a seat. Again, if you wind up on the jury, I have to rely on you if you have a problem, otherwise, I won't know, okay, and if it works, if it turns out that it is just too much for you to serve, that's why we impanel four alternates so we have some flexibility, okay.

In the meantime, I'm going to ask you to try to gut it out for a little while here, and if you can't take it, raise your hand, and we'll deal with it.

THE JUROR: Can I go now?

10:19AM THE COURT: Can I get you to sit for a little bit?

THE JUROR: Okay. Thanks.

THE COURT: I'm sorry, we have one more. We're going to get into more meaty questions, I think. What's your name and jury number?

THE JUROR: Derek Osterman, 69. I'm not 100 percent

this is the appropriate time to bring this up.

THE COURT: Okay.

THE JUROR: I do have some health issues are requiring me to be at Beth Israel one or two times a week for the foreseeable future. I'm doing immunotherapy for some allergies. I brought my schedule if it's relevant. I'd be happy to serve, but the timing isn't great.

THE COURT: What time of day are these?

THE JUROR: I'm taking the early appointments that are available, so it's typically Monday and Wednesday at seven, and I'm required to sit there to make sure there's no anaphylactic shock after it, so potentially I could be here by nine, but there's some risks.

10:19AM

THE COURT: Okay. Here's what I'm going to do. At the end of the day, I may just let you go, but I'm going to hold onto you just for now.

THE JUROR: Okay.

THE COURT: Let me see how this plays out and how many people I need and so on.

10:20AM

THE JUROR: Sure.

THE COURT: I think that's probably reason enough for me to let you go, but I'm going to hold on for now.

THE JUROR: Okay. Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: Have any of you heard or read anything

about this case in newspapers, on the Internet, radio, anywhere else? Okay. I see a couple hands. I'll see you.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: Was there any coverage at all? There was coverage of this?

MR. GARLAND: I didn't see any.

THE JUROR: Back again. All right.

THE COURT: I'm sorry. Your number?

THE JUROR: Derrick Osterman, 69.

10:21AM THE COURT: 69.

THE JUROR: Just in preparation for today, I took a quick look at the Court schedule, and I knew there was a press release from 2017 from the U.S. Attorney's Office, so basically that had the same information that you presented us with this morning that, you know, a little bit more about travel into the Congo and India and Canada, so I don't have detailed information on the case.

THE COURT: Okay.

THE JUROR: But I do understand it's an immigration

10:21AM case.

THE COURT: Obviously, that's a press release, that's not evidence. Is there anything about that that would affect your ability to listen to the evidence? For example, suppose the evidence were different from that, suppose the defense put on evidence -- they don't have to put on anything at all, but

suppose they put on evidence challenging any of that, would you be prepared to consider that with an open mind?

THE JUROR: Yes.

THE COURT: Again, to be fair to both sides?

THE JUROR: Sure.

THE COURT: Can I get you to step away for a second and let me talk to the lawyers?

THE JUROR: Yes.

THE COURT: Do you want me to pursue this further or what do you want me to do?

10:22AM MR. LAUER: I'm not asking you to pursue it further.

THE COURT: Okay. Thank you.

Next.

THE JUROR: Hi.

THE COURT: What's your name and number?

THE JUROR: Stephanie Andersen.

THE COURT: Number 12.

THE JUROR: I got the name from this case because he crossed at the Maine border, I saw that Canada denied his asylum case twice and that he was supposed to be deported to Rwanda to face his more criminal hearings there.

10:22AM

THE COURT: Okay. And where did you see that?

THE JUROR: I think I saw the clips Senator Collins gave a couple years ago about the border crossing, and I just read other things, so the Rwandan newspaper had an article on

it.

THE COURT: So looking at the Internet?

THE JUROR: Yeah, Internet stuff, just general news sources.

THE COURT: Let me ask you a couple questions. Your spouse is an attorney?

THE JUROR: Yes.

THE COURT: What does he or she do?

THE JUROR: He's an attorney at Ropes & Gray, mostly

10:23AM private equity, but he has some asylum and pro bono cases as well.

THE COURT: Asylum, meaning immigration asylum?

THE JUROR: Yeah, Cameroon he's done a case or two for.

THE COURT: And it says you're the primary caregiver for two children. Would that be an issue for you?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: Well, my daughter is in kindergarten, so

10:23AM that only goes to 12:30. My son is three, so I'm home with him all the time. My husband is taking today off to be with them.

THE COURT: He's taking today off to be with him. Do you have backup childcare?

THE JUROR: I would have to hire someone.

THE COURT: Could I get you to step away for a second.

All right. I guess I'm probably inclined on the whole to let her go rather than explore this farther.

MR. LAUER: I'd ask you to dismiss her. She has quite a bit of external information.

MR. VARGHESE: That's fine.

THE COURT: Okay. All right. I think the prudent thing to do is to let you go.

THE JUROR: Okay. Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

10:24AM THE COURT: Ladies and gentlemen, as I told you, this case involves at least in part events in Rwanda that have come to be known as the Rwandan genocide. I expect that there will be evidence in different forms concerning the killing of human beings on a large scale, and I expect there will also be evidence of violent attacks and rapes and sexual assaults.

Some of that evidence may be unsettling or disturbing. Obviously, I'm not looking to impanel jurors who do not experience normal human emotions or who are cold or insensitive, I'm looking, of course, for ordinary, decent 10:25AM people who will take their responsibilities seriously and will exercise their authority to the best of their ability even if at times the evidence is unpleasant to hear.

And, of course, jurors have to be fair to both sides. If any of you think you may have a strong emotional reaction to that evidence such that it would affect your ability to be fair

or might affect your ability to be fair, I need to know that. Again, the bottom line is you need to be fair and open-minded to both sides regardless of what the evidence shows.

So with that as an introduction, do any of you think due to the nature of the case that you may have a reaction such that it would affect your ability to be a fair and impartial juror in the trial of this case? All right. I see no hands.

There's a related aspect of this case I want to address. Sadly, the history of the human race involves 10:26AM multiple episodes of genocide or large scale killing based on religion or race or ancestry. Some of you may be survivors of those events or may be related to or friends with people who have experienced such events. Of course, we're not sitting in judgment in every event that occurred in Rwanda in 1994, and we're not dealing with other genocides or mass killings.

The defendant is charged with very specific crimes, as I've explained to you, but, again, if any of you think that you may have a strong emotional reaction to the evidence based, again, on its subject matter, I need to know that, so is there 10:27AM anything about the aspect of this case that involves the genocide that would affect your ability to be a fair and impartial juror in the trial of this case? All right. I see no hands.

All right. As you know, the immigration policies of the United States have been news quite a bit in recent months.

A lot of people have strong views or feelings on immigration issues, as they're entitled to do.

This case involves a specific set of charges, basically whether the defendant lied in connection with his application for asylum at an immigration hearing, but it's not a vote on our immigration policy or anything else that's happening anywhere else in the country. Again, it's a specific set of charges that the government has to prove.

Again, everyone is entitled to have feelings about 10:28AM immigration or illegal immigration, that's entirely your right. I don't need to know what those opinions are, but I do need to know if any opinions or feelings you have about immigration or immigration issues might in some way affect your ability to be a fair and impartial juror in the trial of this case.

And that's true whether you would be biased against the defendant, against the government or both or otherwise if it would affect your ability to be fair.

So with that, do any of you have any strong feelings or beliefs about immigration or immigration policy or 10:28AM immigrants that would affect your ability to be a fair and impartial juror in the trial of this case? Okay. Let me see you one-by-one.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE JUROR: 69.

THE COURT: Yes.

THE JUROR: So I've run Colliers International Office in Rhode Island, and we have recently hired a refugee who's a member of a family who are refugees from Aleppo.

THE COURT: Aleppo, Syria?

THE JUROR: Yes, and as a result of the personal relationship, I would tend to favor the refugee understanding that things happen in a war zone that you do what you need to do to survive.

THE COURT: All right. I think the combination of the

10:29AM health issues and that and the press release I think are enough to get you out of my conscious, Mr. Osterman, so I'm going to let you go. Good luck with your health.

THE JUROR: Thanks.

THE COURT: Next. Your name and number.

THE JUROR: Number 38.

THE COURT: Yes, sir.

THE JUROR: Well, I mean, just from the thumbnail sketch at the beginning.

THE COURT: I'm sorry.

10:30AM THE JUROR: The thumbnail sketch that you gave at the beginning, I did immediately jumped to the question as to when this prosecution started and political considerations, I mean, filling in the blanks, but I'm guessing this is going to be a predicate to canceling his legal status or citizenship, something like that. I don't know, obviously, I don't know a

lot, but that's the immediate thought that I have.

THE COURT: I'm sure you know as someone who practices criminal defense for a living that the jury is required to, you know, render a verdict of guilty or not guilty based on the evidence and without regard --

THE JUROR: Certainly.

THE COURT: -- to not only the criminal sentence but any other consequences.

THE JUROR: Right.

10:31AM THE COURT: And you tell me you think you may have trouble keeping that out of your mind and rendering a fair verdict? It's fine, I can't look inside your mind.

THE JUROR: I think in general, I would -- if I was being honest, I would have to have a very cynical viewpoint as to when these types of charges are being prosecuted and why, and I don't know that I necessarily would be fair to the prosecution in that event.

THE COURT: All right. I think then that this is not the right kind of case for you to sit on, so I'm going to let go.

10:31AM THE JUROR: Thank you, your Honor.

THE COURT: Next. What's your name and number?

THE JUROR: Ning Wang, 64.

THE COURT: Yes, sir.

THE JUROR: So while both my wife and I have lived in

South Africa for a few years.

THE COURT: Whereabouts?

THE JUROR: I was in Ghana, my wife was in Cameroon, and we both know people that applied for visas and it's a different culture and what we would have to do in these applications, I have my own opinions about that.

THE COURT: You don't have to erase your life experience. Again, we want people with every different kind of experience.

10:32AM THE JUROR: Yes.

THE COURT: But you have to be fair, and, obviously, the experience of people you knew in Ghana and Cameroon is not what Mr. Teganya's experience is going to be, and the bottom line is you have to be open-minded and fair and treat both sides fairly.

THE JUROR: Okay.

THE COURT: If you are not sure whether you can do that, you have to tell me that. I can't look inside your head you don't have to look, so you are the only one who can tell me that.

10:32AM THE JUROR: I have my own opinions about people's motivations. When they file immigration, a lot of people lie on the applications.

THE COURT: Okay. And a lot of people tell the truth.

THE JUROR: True.

THE COURT: That doesn't answer the question whether he's guilty or not guilty of the charges. You know, it's like I tell people in drug cases, you know, people say there's a lot of drug dealers. That doesn't mean he's a drug dealer. It has to be focused on this person's guilt or lack of guilt.

THE JUROR: Right.

THE COURT: And if you are not sure you can be fair, that's fine. If you think you can, tell me that as well.

THE JUROR: I think I'm fair based on my own life 10:33AM experiences what I've seen based on the number of people I've dealt with, but I don't know if other people consider that fair.

THE COURT: Well, again, only you can tell me whether you can be fair. Are you telling me you think you can be fair to both sides, both sides, be prepared to vote for either side depending on how the evidence plays out?

THE JUROR: I don't know if I could be fair.

THE COURT: In that case, I'm not going to try to talk you out of it, I'm going to let you go.

10:33AM Next. Hi what's your name and number?

THE JUROR: Number 37, Yvonne Cook.

THE COURT: Okay, yes.

THE JUROR: Well, I don't know, becoming a citizen in 1985.

THE COURT: Okay.

THE JUROR: So I've already found him guilty for that reason to lying to immigration, do you know what I mean?

THE COURT: In other words, you think already that he's lied even though you haven't heard any evidence?

THE JUROR: Yeah.

THE COURT: Okay. In that case, I think I better let you go, Ms. Cook. Thank you.

Next. Hi, what's your name and number?

THE JUROR: Carol Berna, Number 30.

10:34AM THE COURT: Okay.

THE JUROR: I just wanted you to know my son-in-law is here on asylum from Africa but Kenya, not Rwanda. I don't know the difference.

THE COURT: So, in other words, he applied for and was granted asylum?

THE JUROR: Yes.

THE COURT: Okay. So, again, the bottom line question is whether you can be fair to both sides. We want people with all kind of experience.

10:35AM THE JUROR: I think I can, but I didn't know if it made a difference.

THE COURT: If you think you can be fair, I'll accept that.

THE JUROR: I do.

THE COURT: Okay. Next. Hi, what's your name and

number?

THE JUROR: I'm Julian Saleh, Number 29.

THE COURT: Julian Saleh, yes, sir.

THE JUROR: This might sound a bit unsavory, but to be frank, politically, I don't approve of much immigration at all, legal or illegal, and I'm also not politically ignorant of what went on in Rwanda, and given that, regardless of what accused crimes the defendant has committed, I don't think in a million years anyone here could convince me he should be allowed to even be in this country.

10:36AM

THE COURT: Okay. I think this is then not the right case for you to sit on, so I'm going to let you go.

THE JUROR: Okay.

THE COURT: Next. Hi, what's your name and number?

THE JUROR: Donna O'Callaghan.

THE COURT: Number 7.

THE JUROR: I don't have an issue with immigrants. I want to go back to your previous statement about the nature.

THE COURT: Yes.

10:36AM

THE JUROR: My mother just passed away, and I've been on anxiety meds. and I'm afraid of what I might see. I don't know if I'm going to be able to handle seeing deaths.

THE COURT: Okay. In that case, I think probably this isn't the right case for you to sit on, so I'm going to let you go. Thank you. Good luck. Next.

Hi, what's your name and number?

THE JUROR: Hi, I'm Number 25.

THE COURT: Yes, sir.

THE JUROR: So I just want you to find out that I sort of would be objective and looking at both sides, but I need to be honest and point out I do have some strong opinions with respect to immigration.

As an example, I mean, Immigration Number 65 is a game changer. I consistently watch, for instance, Fox News every night, Jeff Ulmer, immigration what's going on down at the border. The fact we have a political order that's changing the voting block, you know, I am so anti-immigration to a certain point. I think it's out of control, and I think I'm hesitant even seeing it.

THE COURT: Again, everyone is entitled to their own views.

THE JUROR: I get that.

THE COURT: The question is it going to affect you in this case? This is not about whether we're going to build a wall or what our policy ought to be, and I think probably all of us agree that everything is a screwed up mess.

THE JUROR: Right.

THE COURT: It's a question of whether he is guilty or not guilty, has the specific charges, and if you think all of this is going to be affect your ability to be fair, I can't

look inside your head.

THE JUROR: I understand. It's what I just said, I think it's somebody trying to gain the system or somebody is trying to go outside the law. So, it's up to you. I would sit there and listen. I probably have those preconceived ideas, so I just think --

THE COURT: Okay. I think I'm hearing you express some doubt whether you can be fair, and I think that's fair enough and on top of that you live in Sagamore; is that right?

10:39AM THE JUROR: Yes.

THE COURT: I'm going to let you go, thank you.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: Hi, 73.

THE COURT: 73. Okay.

THE JUROR: I do have a strong beliefs about immigration. I think some of the things that happened to the United States is because we did let some immigrants in, and I also work at a preschool, and one of the fathers works for Homeland Security. I missed the last name that you said, but his name is Matthew Angelo, I don't know if you know him.

MR. VARGHESE: I'm sorry, what was the name?

THE JUROR: Matthew Angelo.

MR. VARGHESE: Matthew Angelo?

THE JUROR: Yes.

MR. LAUER: Immigration Judge Matt Angelo.

THE COURT: Let me go back to the immigration piece of it.

THE JUROR: Okay.

THE COURT: So do you think -- I mean, again, probably everyone in the room has strong feelings about immigration one way or the other.

THE JUROR: Yeah.

THE COURT: But the question is, you know, this isn't 10:40AM American immigration policy on trial, it's a very specific trial about a very specific set of charges, and what I need to know is whether you can be fair to both sides. I can't look inside your head. Only you can tell me.

THE JUROR: I don't know if I can be.

THE COURT: I think that's a show-stopper, so I'm going to let you go.

THE JUROR: Thanks.

THE COURT: Next.

THE JUROR: My name is Cayla Stafford, 65.

10:41AM THE COURT: 65. Okay.

THE JUROR: My fiance' and his friend work for the Massachusetts State Police. I don't feel I could be impartial to obeying rules and anything like that.

THE COURT: So you think you'd be biased in favor of law enforcement?

THE JUROR: Yeah.

THE COURT: I'm going to have to let you go then. Thank you.

THE JUROR: 17.

THE COURT: Okay. Yes, sir.

THE JUROR: I've been an officer, MCI-Concord as a correctional officer for 10 years now, and I've been assaulted numerous times by inmates. I am currently out of work right now from an assault involving (unintelligible). I have very strong feelings towards them.

10:42AM

THE COURT: Meaning that you could not be fair?

THE JUROR: Yeah.

THE COURT: Okay. I'm going to let you go, thank you. Next.

THE JUROR: Good morning.

THE COURT: What's your name and number?

THE JUROR: Matthew Smith, Number 20.

THE COURT: Number 20, yes, sir.

THE JUROR: I've been a strong proponent of closing the borders since 9-11. This is kind of twofold for me. This is more what's going to be a financial burden for me if I get picked for this. I haven't worked for three years. My wife has got disability, and I won't be able to do this for four or five weeks.

10:42AM

THE COURT: And I think I heard you'd be biased?

THE JUROR: Yes.

THE COURT: I'm going to let you go, thank you, Mr. Smith.

THE JUROR: Thank you.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: What's your name and number?

THE JUROR: Lina Hoang.

THE COURT: Lina Hoang, Number 4. Yes.

10:43AM THE JUROR: So my parents escaped the Vietnam War, and I feel like if that was my dad, and just because he did something in the old country, I don't think that he should be I guess tried now because it happened back then.

THE COURT: Okay.

THE JUROR: I wouldn't want my father to go through all of this because he saw a new opportunity there unless he broke laws here and killed people or things like that, I don't believe that he should.

THE COURT: So I think I hear you saying you'd have

10:43AM trouble being fair to both sides?

THE JUROR: Yes.

THE COURT: I'm going to let you go, Ms. Hoang. Thank you.

Next. Hi, what's your name and number?

THE JUROR: 67.

THE COURT: Yes, Mr. Paul.

THE JUROR: My brother works for ICE, so I have a bias towards people trying to come in illegally.

THE COURT: Okay.

THE JUROR: I don't know if I could shake that bias.

THE COURT: Okay. I'm going to have let you go then, thank you, Mr. Paul, 67.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: All right. As I indicated, this case will

10:44AM take four or five, possibly six weeks to try. Our normal trial day will be from 9 to 1. We may have an occasional afternoon session. I won't do that without checking with the jury first or letting them know to make sure everyone is available and they'll be no hardships. Once the jury begins to deliberate when it gets the case, it has to deliberate all day from 9 to 5 until it reaches a verdict. It may not take that long, but you have to plan for that possibility.

Now, obviously, anybody who serves on this jury is going to be inconvenienced, but do any of you have any unusual

10:45AM hardship caused by the length of the trial? I'll take you one-by-one.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: All right. So you are Number 59, Mr. Welch.

THE JUROR: 59.

THE COURT: Number 59, Mr. Welch. Yes, sir.
THE JUROR: I've got a couple of trips already planned and booked in the next six weeks, April 8th and April 12th to the 15th.
THE COURT: Prepaid vacation?
THE JUROR: Yeah.
THE COURT: To where?
THE JUROR: The 8th is to New Orleans and the 12th to the 15th is South Carolina.
10:46AM THE COURT: Okay. All right. Here's what I'm going to do. I will probably honor that and let you go, but just for now until I'm sure I have enough people, I'll hang onto you.
THE JUROR: Okay.
THE COURT: We'll see how this plays out. You're a little bit far down the list, and hopefully we won't get to you at all, so I guess I'll try to honor it, but I can't promise it just yet.
THE JUROR: Okay.
THE COURT: Next. What's your name and number? 79,
10:47AM Mr. Herd.
THE JUROR: Yes.
THE COURT: Yes, sir.
THE JUROR: I want to preface this by saying I no way mean disrespect the significance of this, but I wanted to let you know the hardship I'm asking you about is that I have a

commitment. I'm a researcher at M.I.T. and have committed to give a plenary talk on the 3rd of April in Krakow, Poland, and the subject of that talk is remembrance for a colleague who passed away last year, and his entire family will be travelling to the conference with that.

THE COURT: Okay. That sounds like the kind of thing that probably we're not going to be able to postpone, so I'm going to let you go. Thank you.

Next.

10:48AM THE JUROR: Number 46.

THE COURT: Number 46. Yes, sir.

THE JUROR: I travel a lot for work, but I'm specifically leaving on Wednesday to Mexico for five days. Depending on the trial's start date, that's the biggest conflict for me.

THE COURT: Is that a sales sort of thing?

THE JUROR: No, sir, I'm taking my family to Mexico.

THE COURT: A family trip. So it's a prepaid vacation?

10:49AM THE JUROR: Yes, sir.

THE COURT: In that case, I'm going to let you go.

THE JUROR: Okay. Thank you very much. I appreciate it.

THE COURT: Next.

THE JUROR: Juror 57.

THE COURT: 57. Yes.

THE JUROR: Two things, sorry, at 9:00 start should be okay with dropping my kids off, but if my husband is traveling, I have to pick them up at 5:30 or 6:00, I don't know if we don't get out until five certain days, and then second, I have a vacation planned to California, and so I was wondering how that worked with nonrefundable flights and stuff.

THE COURT: When is the vacation?

THE JUROR: Leaving on March 23rd.

10:49AM THE COURT: Is that the whole family?

THE JUROR: Yes.

THE COURT: Okay. All right. I'm going to let you go, Ms. Rucci. Thank you.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: Number 11.

THE COURT: Number 11, Mr. Lander. Yes, sir.

THE JUROR: I started a new job on the 18th with some travel. The extended length of the trial will be difficult.

10:50AM THE COURT: What's the new job?

THE JUROR: I work for a presidential campaign.

THE COURT: Presidential campaign?

THE JUROR: Yes.

THE COURT: For which candidate?

THE JUROR: For Elizabeth Warren.

THE COURT: Are you going to be principally placed in Cambridge or in Boston?

THE JUROR: I will be principally based in Boston, but I anticipate travel. The other thing I wanted to bring up the question is I have been to Rwanda on a couple of occasions.

THE COURT: Okay.

THE JUROR: And I've studied the genocide. I think I could be impartial, but I have significant exposure to it.

THE COURT: Okay. Let me take that up first. Again, 10:51AM we want people who know things, but the case does have to be decided on the evidence presented at trial, in other words, you can't erase your life experience, you are who you are. On the other hand, you have to focus the specific evidence presented to the Court and not because, you know, you can't convict or acquit someone because you knew about somebody else who did something similar, you know, and if you're confident that you can be fair to both sides, I'll accept that, but you're the only one who can tell me.

THE JUROR: I think so, but I probably do have 10:51AM unconscious bias.

THE COURT: In what sense? I mean, it can't be unconscious if you're --

THE JUROR: Right. Probably I would say probably more bias towards -- I would be biased towards witnesses who were victims, I think.

THE COURT: Of course, a victim is a conclusion.

THE JUROR: Yeah, yeah.

THE COURT: You have to listen to the witness to know whether or not they are a victim, but, all right, I think between the new job and this, I think I should let you go, so I'm going to let you go.

THE JUROR: Okay.

THE COURT: Next.

THE JUROR: Hi.

10:52AM THE COURT: All right. Ms. Daly, Number 45. Yes.

THE JUROR: I work in the middle high school as a school social worker.

THE COURT: Okay.

THE JUROR: And I assess kids for suicidiality often, and I'm the only person who does that at my building, so I'm concerned about my caseload and what would happen to them if I'm not there.

THE COURT: Okay. Who covers for you when you're on vacation or things like that?

10:53AM THE JUROR: I don't take vacation unless the school takes vacation.

THE COURT: Okay.

THE JUROR: Like a day is fine or two days, but weeks and weeks... A lot of the students don't really -- some of them don't trust to tell other people things because I have a

relationship with them, and for some students, I'm their sole mental health provider.

THE COURT: Okay. And you'll be out basically every day at one o'clock.

THE JUROR: School closes at 2:15.

THE COURT: Do students call you after hours or talk to you after hours?

THE JUROR: I'm actually on call. Sometimes the police call me for assistance in the town that I work in because I know so many of the kids.

10:53AM

THE COURT: Okay. Can I get you to step aside, let me talk to the lawyers for a second.

THE JUROR: Sure.

THE COURT: What do counsel think?

MR. LAUER: I would defer to the Court, your Honor, I don't have a strong feeling.

MR. VARGHESE: Same.

THE COURT: What do you think? -- I'd like to do this, I would like to drop her down to the end of the list, in other words, not let her go completely but just in case we get caught short, I can examine some of these types of issues where it's not ideal but we might need them to be available. Is there any objection to me doing that?

10:54AM

In other words, sort of kicking the can down the road, and it will mean it's much less likely, of course, she'll be

called. We might never reach her but rather than letting her go altogether. Any problem with that?

MR. LAUER: No.

MR. GARLAND: No.

THE COURT: Ms. Daly. All right. Here's what I'm going to do. I'm going to drop you to the end of the list, which makes it much, much less likely you'll be called. I can't make any promise, but I just want to make sure at the end of this I have enough people, so I'll revisit. There will be a 10:55AM couple of other people that will be like you that this should work out, but I'm not going to let you go just now. I won't make any promises.

THE JUROR: Okay, thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: What I'm going to do, ladies and gentlemen, is I know there's some people anxious to take a break. I'm going to go until eleven and then take a break. It's complicated and everyone has to leave and come back at the same time. If you'll just bear with me for another five 10:55AM minutes or so.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE JUROR: 71.

THE COURT: Juror Number 71. Okay. What's your situation?

THE JUROR: Well, I have two kids, I have a

four-year-old and a ten year-old, and the little one goes in the middle of the day to preschool, and I'm in the middle of moving so the process is kind of long for me.

THE COURT: Who is taking care of your four-year-old?

THE JUROR: Right now her dad took the day to take her to school and pick her up.

THE COURT: Okay. And the ten year-old is in school?

THE JUROR: In school, yeah.

THE COURT: You work at Good Samaritan Hospital; is

10:56AM that right?

THE JUROR: Yes.

THE COURT: Do they have a backup day care center?

THE JUROR: No, they don't.

THE COURT: All right. I'm going to let you go.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: Good morning again. Nicholas Hatheway, Number 68.

THE COURT: Yes, sir.

10:56AM THE JUROR: Okay. Well, I'm happy to be here and serve, but I do own and operate a small automotive repair shop, and that kind of time would pose a significant financial burden, and worse than that, my wife's scheduled a family vacation April 12th to Mexico.

THE COURT: Okay. All right. I'm going to let you

go. Okay.

THE JUROR: Okay.

THE COURT: Hi.

THE JUROR: Good morning.

THE COURT: 35. Mr. Girardi.

THE JUROR: Yes, sir. It would be pretty stressful for me not be able to travel and work for four to five, six weeks, and my travel is typically planned out a week to two weeks out, so it's hard for me to go day by day.

10:57AM THE COURT: What kind of work do you do?

THE JUROR: VP of sales and marketing for a robotics company.

THE COURT: And typically what is your travel?

THE JUROR: Like Tuesday, I can't make the meeting. I'm in Houston on Tuesday, the one you were talking about for next week, as an example.

THE COURT: One advantage of the 9 to 1 schedule people can, you know, get a few hours in at the end of the day.

THE JUROR: Yes.

10:58AM THE COURT: They can skype and do things like that.

THE JUROR: I think I can pull off the 9 to 1, the travel for me is just very, very limiting.

THE COURT: Okay. Can you step away and let me talk to the lawyers.

THE JUROR: Sure.

THE COURT: Any thoughts on this?

MR. LAUER: Again, your Honor, I don't necessarily have a strong feeling about these sorts of things.

MR. VARGHESE: The only concern I have is that this is going to affect him so he would be stressed about it.

THE COURT: I'm going to drop him to the end of the list. Mr. Girardi, here's what I'm going to do. I'm going to drop you down to the end of the list. That will reduce the likelihood you'll be called, but I can't make any promises. I need to make sure I have enough people.

10:59AM

THE JUROR: I understand.

THE COURT: I may revisit this, but for now I'll take you out of order and reduce the likelihood you'll be picked.

THE JUROR: Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: All right. It's 11:00. What I'm going to do, we're going to take a break in order to permit you all to use the facilities. You cannot leave this floor basically. You can be in the room or you can go to the bathroom. If you smoke, you can't go downstairs and have a cigarette. I need everybody on this floor. We have to count you. We can't start up again until everybody is back, so I'll ask that you do this as quickly and as orderly as you can so we can keep moving and get this process underway, and I know some of you are in line.

10:59AM

We'll ask the line to be reassembled when we get back

so we can start up again right where we are, but I ask for your cooperation. Those of you sitting in the jury box, I'll ask you to move to benches in the back of the room because we have enough space now.

THE CLERK: All rise.

(A recess was taken.)

THE CLERK: All rise.

THE COURT: Thank you for your time. Is the line in the same order? Did anybody take cuts? Okay. I'll see the

11:14AM first person.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE JUROR: 27.

THE COURT: 27. Yes, sir.

THE JUROR: So I'm self-employed as a life science consult. Essentially if I don't work, I don't make any money. I currently have two contracts in place, one is for 20 hours and another is up to 30 hours. The one for 30 hours actually has some specific deliverables tied to it, which what I'm more concerned about is economic because I've been working for a

11:15AM startup for the last year, so last year I only earned about 24K, so there's not much of a buffer zone in my account and not earning for a month, month and a half is problematic.

THE COURT: Okay. When you say 20 hours, you're up to 30, is that per week, is that the idea?

THE JUROR: Yes, sorry. Some contracts can be based

on deliverables.

THE COURT: Right.

THE JUROR: And others are hourly.

THE COURT: And, again, with a 9 to 1 schedule, do you work out of your home?

THE JUROR: No, I mostly work on site. I work one day a week at home, two days at Carrier Farm, which is one of the companies.

THE COURT: Where are they located?

11:16AM THE JUROR: They are in Newton, and the other is Launch Pad Medical, which is in Lowell.

THE COURT: All right.

THE JUROR: And I meet with people there, so it's difficult to not actually be there.

THE COURT: Okay. All right. Let me talk to the lawyers for a second. I guess my instinct is put him at the end of the list. What do counsel feel?

MR. LAUER: He seems to be in a salary position as opposed to the other people you dropped out.

11:17AM THE COURT: Mr. Eby, what I'm going to do is I'm going to drop you to the end of the list, which will make it less likely that you will be called. I may let you go anyway. I have a number of other people that have similar sorts of issues, so I want to make sure. This will probably work out, but I can't quite promise it yet.

THE JUROR: Okay.

THE COURT: Next.

THE JUROR: I'm Robert Baroni.

THE COURT: Robert Baroni, Number 19. Yes, sir.

THE JUROR: I own and operate seasonal businesses on the Cape, one of them being a hotel, and it's opening late April, and I have to hire a staff of about 20 and train them. Normally we get our staff through the H-2B visa program, but the last couple years we haven't been able to get them, so I do about four jobs down there now, and I have to hire a complete staff.

11:18AM

THE COURT: Okay. You live in Yarmouthport; is that right?

THE JUROR: Yes, the business is in Dennis.

THE COURT: And you're opening for the season in late April, and you do the hiring?

THE JUROR: Yeah. Well, I own the place, I manage it, I work desk, I do whatever you have to do there, but, yeah, I'm going to be hiring up to 20 people. We own an ice cream shop, a house rental business, and I basically have limited staff.

11:18AM

THE COURT: But that hiring process, I guess I'm asking, does it happen now?

THE JUROR: Yes.

THE COURT: Okay. In other words, before you open in late April?

THE JUROR: Well, it's going to happen all the way through. I'm going to hire as I go. Usually you're short on staff, so, you know, I do four to five jobs there. You know, I have time now, like the month of March I have time, but come April 1st, I don't have any time.

THE COURT: Okay. All right. Here's what I'm going to do. I'm going to drop you to the end of that list. That will make it less likely that you'll get called, and this may work out, I may let you go anyway, but I want to make sure I

11:19AM have enough people, so let's see how this plays out, and I may call you back up here to explore this a little bit further.

THE JUROR: Okay.

THE COURT: Thank you. Next.

THE JUROR: Good morning. 32.

THE COURT: 32. Ms. DiPalma.

THE JUROR: Yes.

THE COURT: What's your situation?

THE JUROR: I'm very concerned about the financial situation it's going to put me in to be here over two weeks.

11:20AM THE COURT: Okay. And do you know whether your employer will pay you? You work for a dermatology group?

THE JUROR: Yeah, they'll pay me for the three days, and I have use my vacation time after a couple weeks. I don't know what I'm going to do, I live alone, and I don't have anybody to supplement that.

THE COURT: Is that what they told you, you'll have to use your vacation time?

THE JUROR: Well, if I take any time off, I have to use my vacation time after the three days that the Court requires.

THE COURT: Okay.

THE JUROR: I just did state jury two weeks ago, and they already paid me for that.

THE COURT: All right. Does it help at all if you're
11:20AM out of here every day at one, back in Chelmsford, two-thirty, does that do you any good?

THE JUROR: We close at five. I don't know how much -- I mean, anything would help.

THE COURT: Okay. Can I get you to step a side for a second?

THE JUROR: Yes.

THE COURT: Counsel.

MR. LAUER: It streaks me that she seems to have a significant financial burden here.

11:21AM MR. VARGHESE: I think excuse her.

THE COURT: Ms. DiPalma, I'm going to let you go.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: Number 6.

THE COURT: Number 6.

THE COURT: Ms. Ferzoco.

THE JUROR: Yes.

THE COURT: Yes.

THE JUROR: I own a small business with my sister. Four to five weeks, it's only us two full-time employees, I have another part time employee who has another job. Four or five weeks would just absolutely shut us down. I have to forego my salary, we'd have to get a temp. agency or somebody to get help in there.

11:22AM THE COURT: What's the business?

THE JUROR: It's a restaurant, lunchette and general store.

THE COURT: Where is it located?

THE JUROR: In Hyde Park on River Street.

THE COURT: Okay.

THE JUROR: I work 45 to 61 hours every other week. I had my knees replaced. I couldn't get paid because we didn't have that money, and I don't see how I could have anybody fill in. Shorter trial, I could have swung.

11:22AM THE COURT: What about the fact if we're out every day at one, you could be at Hyde Park at two, would that help? In other words, what are the hours?

THE JUROR: The hours are from 6 to 5.

THE COURT: That's when --

THE JUROR: 6 a.m.

THE COURT: -- the place is open?

THE JUROR: Yes.

THE COURT: Okay.

THE JUROR: I don't have anyone to cover for me. We'd have to try, we'd have to hire outside help. I don't know. We'd have to go through a temp. agency.

THE COURT: Okay. Can I get you to step away for a second? Yes. All right. Counsel.

MR. LAUER: I wouldn't object to her being excused.

11:23AM MR. VARGHESE: That's fine.

MR. GARLAND: I think the same.

THE COURT: Ms. Ferzoco. Okay. I'm going to let you go.

THE JUROR: Thank you, sir.

THE COURT: Next. What's your name and number?

THE JUROR: 75.

THE COURT: Mr. Perez.

THE JUROR: So I have a couple of unusual hardships. My mother has a pacemaker, so I'm the No. 1, her only emergency

11:23AM contact, so it makes it unfortunate for me not to be able to do something, but, you know, she needs my care.

THE COURT: Okay.

THE JUROR: Also, my job is strictly commission. Whether I'm there, you know, I don't sell something, if I'm not there, I don't get paid.

THE COURT: Okay.

THE JUROR: I'm the main person bringing in, you know, in my house.

THE COURT: Okay. And you work at Atlantic Toyota; is that right?

THE JUROR: Yes.

THE COURT: Is that in Lynn?

THE JUROR: It's in Lynn.

THE COURT: So if we're out at one, you could be at 11:24AM work at two. Would that help with any of that? Does the dealership have -- it must have afternoon hours?

THE JUROR: Yeah, Monday through Thursday, but the case of my mother, she needs somebody to be emergency contact at all times.

THE COURT: Okay. Here's what I'm going to do. I'm going to leave you on. For one thing, you're very much at the end of the list. That doesn't necessarily mean you won't get called, but in the situation with your mother, what we'll do is if you wind up on the jury and you get contacted and you need 11:25AM to go, it's one of the reasons we have alternates. If an emergency comes up, we can let you go, and, you know, if you find out that there's an issue and you need to get out of here, let me know, and we'll let you go.

THE JUROR: Uh-hum.

THE COURT: So I'm going to leave you on for now, and

we'll see how that plays out. Thank you, Mr. Perez.

Next. Number 1. Yes.

THE JUROR: I have a vacation planned April 11th through 18th. It's all paid for. If this would go five weeks, it would go right into that.

THE COURT: Where is the vacation to?

THE JUROR: Mexico.

THE COURT: I think all you jurors are going to the same place at the same time.

11:26AM THE JUROR: You can come if you let me come.

THE COURT: Do you want to trade places, I'll go to Mexico, you can -- all right. I'm going to let you go

THE JUROR: I never thought there would be a trial that would go that long.

THE COURT: I'm going to let you go. Good luck.

THE JUROR: Thank you.

THE COURT: Next. Mr. Farmer, Number 56.

THE JUROR: I'm currently a full-time engineering student. There's my I.D., so a trial that would last basically

11:26AM four to six weeks of my semester would ultimately result in an incomplete grade in all of the courses I'm taking.

THE COURT: You're full time at UMass Lowell?

THE JUROR: Yes.

THE COURT: And I assume a day student?

THE JUROR: Yes.

THE COURT: All right. I'm going to let you go, Mr. Farmer.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: 54.

THE COURT: Ms. Young.

THE JUROR: Yes.

THE COURT: Okay.

THE JUROR: As a scientist, I find myself very impartial, but I have several events coming up over the next month that are impossible to reschedule, I have to travel for the Association for Cancer Researchers in Atlanta starting on the 30th, and that's about five days.

THE COURT: Okay. Where do you work and what is your work exactly?

THE JUROR: I work for the Scientist Magazine. I'm their director of creative services.

THE COURT: Oh, for the magazine?

THE JUROR: Yes.

THE COURT: And you're covering a conference in Atlanta?

THE JUROR: Yeah, I'm attending the conference to meet with our customers.

THE COURT: All right. Is there anyone who can do that for you?

THE JUROR: Unfortunately, no.

THE COURT: All right. Let me do this. Let me talk to the lawyers.

THE JUROR: Okay.

THE COURT: What do you think?

MR. LAUER: Perhaps dropping her, we're getting a lot of people falling in that bucket.

MR. GARLAND: That's correct.

THE COURT: I think that's what I'm going to do.

11:28AM Ms. Young. All right. What I'm going to do is this, I'm going to drop you to the end of the list. That makes it less likely you'll get called. I may revisit this. There's a number of people that have similar situations to yours, and I'll do the best I can, but I will take you out of order and thereby --

THE JUROR: I understand.

THE COURT: -- reduce.

THE JUROR: Yes, absolutely.

THE COURT: Thank you. Just so you know part of my thinking, it's not just to keep people but also I don't like

11:29AM sending a message that every person who comes up here claims a hardship leaves the room, and so it tends to at least let people think twice about it.

Next.

THE JUROR: How are we doing?

THE COURT: Just perfect. What's your name and

number?

THE JUROR: My name is Brian Ross, Number 16.

THE COURT: Yes, sir.

THE JUROR: So I had a colonoscopy and a CAT scan scheduled. I canceled the CAT scan for next week next five, six, seven days, but I wasn't anticipating six weeks, so I canceled it and rescheduled it, and the colonoscopy goes off of that, the CAT scan two weeks later, so I made it for the 20th, and that's my dilemma.

11:30AM THE COURT: Where is this taking place?

THE JUROR: This is Harvard Medical in Weymouth, Massachusetts.

THE COURT: Okay. Let's do this. In my experience, medical providers are pretty good about rescheduling appointments and putting them in the afternoon if we say, you know, you need to do something in the morning.

Now, if it's something you need a long recovery period from or whatever, it's different but I'm going to leave you on for now. If you wind up on the jury, and you may not, and you
11:30AM have any trouble at all rescheduling this and putting it in a position that works for you, let me know. It's one of the reasons we have alternates if something comes up.

THE JUROR: Fair enough, I want to make it to your attention.

THE COURT: I obviously won't remember. If you have

an issue, you've got to tell me if you wind up on the jury.

THE JUROR: Yes. Thanks.

THE COURT: Hi.

THE JUROR: Hello, 76.

THE COURT: Yes.

THE JUROR: So actually I just sold my house, and I'm buying a new house, and we're closing on April 1st at 11 a.m., so I need to be there in order to sign the documents. I don't think I can do that via the Internet.

11:31AM THE COURT: Okay. Here's what I'm going to do. First off, you're pretty far down the list. You're almost at the bottom.

THE JUROR: Okay.

THE COURT: And if push came to shove and you wound up on the jury, you actually can do a house closing -- are you married?

THE JUROR: Yes, I am married.

THE COURT: Because I've done this where my wife couldn't attend.

11:32AM THE JUROR: My husband can do it?

THE COURT: You have to sign additional paperwork and everything, but it's not -- in fact, I did one of these. I won't bother you with the story, but my wife was actually in labor, and I had to buy this house, and I was kind of anxious to get out of there, but, anyway, to make a long story short,

this is a fixable problem if you do wind up on the jury, but if you wind up on the jury and you have a problem, you need to let me know because I will try to help if there's an issue.

THE JUROR: All right. Thank you.

THE COURT: Next. Hi.

THE JUROR: Number 66, Alfredo Sotomayor.

THE COURT: Yes, sir.

THE JUROR: Basically I'm involved in taking care of my mother. She's 98 years old. She was diagnosed with 11:33AM dementia, and I'm involved in taking her to appointments and doing a lot of things for her.

THE COURT: Okay. Does she live with you?

THE JUROR: She lives with my brother.

THE COURT: Okay. Here's what I'm going to do. I'm going to leave you on for now. If you wind up on the jury and you have an issue involving your mother that you can't fix like it's an emergency or your brother is unavailable or whatever, let me know, okay, that's one of the reasons we have alternates is we can let a jury go if there's a problem, okay, so 11:33AM hopefully your mother will be fine and nothing will come up, but if it does, let us know so we can try to deal with it. Thank you.

Next.

THE JUROR: 77.

THE COURT: All right. Mr. Dyer, 77. Yes, sir.

THE JUROR: Yeah, my sister-in-law has cancer. She's going through treatment for cancer. It's now in the liver. It was in the breast. She's been through all kinds of things. I'm the only transport really that she has.

It's a long story, but one son is out on warrants in New Hampshire and Mass., and the other has Lou Gehrig's disease. She's divorced. There's a visiting nurse that comes to take care of her, but there's no other means of transportation except me.

11:34AM My wife would do it except she's still recovering from knee replacements and infection and hasn't driven since November of 2013.

THE COURT: Where does your sister-in-law live?

THE JUROR: Sister-in-law lives in Dracut.

THE COURT: Where is her treatment?

THE JUROR: Lowell General Hospital. She also is receiving treatment for skin edema from a problem she had as a result of the knee replacement for her. That's with Dr. Roman in Chelmsford. She also goes to the pain clinic, which is also 11:35AM Chelmsford, and her CT scans are at Lowell General, and I know where all of them are.

THE COURT: Here's what I'm going to do. I'm going to leave you on for now.

THE JUROR: That's fine. I can do the mornings except that we were able to reschedule the appointments in the

afternoon, but five or six weeks is just --

THE COURT: You're pretty far on the list. You may not wind up on the jury at all. If you do wind up on it --

THE JUROR: We'll talk again.

THE COURT: And if you have a problem that you can't fix, you need to let me know, we'll get you out of here almost every day at one.

THE JUROR: Okay.

THE COURT: Which will help.

11:36AM THE JUROR: Exactly.

THE COURT: And, you know, between Uber and taxis, and we'll see if we can patch this together.

THE JUROR: You know, we don't have Uber up where I live, and we don't have taxis in Dracut.

THE COURT: You don't have taxis but you probably have Uber.

THE JUROR: It's the afternoons that's the real problem, yeah, exactly.

THE COURT: If you have a problem, if you wind up on 11:36AM the jury and you have a problem, you need to let me know because I won't know otherwise.

THE JUROR: Fair enough.

THE COURT: Let's see if we can deal with it the best we can.

THE JUROR: Thank you, sir.

THE COURT: Next.

THE JUROR: Number 15, good morning.

THE COURT: Number 13.

THE JUROR: 13. Hi, I'm an operation manager for a small company in southern New Hampshire, and there's four other people in the office, and my absence would be extremely challenging for the business, as I'm the only person that does things related to finance and HR.

THE COURT: Okay. You live in Billerica; is that right?

THE JUROR: Yes.

THE COURT: We would be out of here pretty much every day at one. Is there any of this that can be done remotely or part time to try to patch together? That's one advantage.

THE JUROR: Some could, but, I mean, it's in southern New Hampshire, so to leave here at one, it would be later that I got there. Some of it would be challenging. The parent company is in the U.K., and obviously the time zones make it challenging for not being available in the morning.

11:37AM THE COURT: All right. Here's what I'm going to do with you. I'm going to drop you down the list, which will make it less likely that you'll be selected, and I can't make any promises. I have a number of people that have situations like yours where, you know, it's going to be very inconvenient, and I need to make sure I have enough people. I may bring you back

up here and talk about this again.

THE JUROR: Okay.

THE COURT: But I'll at least reduce the chance you'll be picked, and we'll see how it goes.

THE JUROR: Okay. Thank you very much.

THE COURT: Next.

THE JUROR: Juror 80.

THE COURT: 80.

THE JUROR: Yes.

11:38AM THE COURT: Mr. Green.

THE JUROR: Yes. My sister-in-law she has terminal cancer, but also for this particular case, I lived in Africa for three months at the Rwanda border in 1983, and I remember both tribes, and I was aware of the hatred between them. I didn't personally observe any violence, but something may be said during the trial that makes me biased.

THE COURT: What do you mean by that? And I guess I'll start with you. You are who you are, your life experience is what it is. Again, this is a case about, you know, whether

11:39AM the defendant told the truth basically on the form and in testimony. What we're going to hear about the genocide, because everything has to be put in context, you know, and the government says that he had some involvement in it, but it's not -- I guess the entire Rwanda genocide is not on trial, let's put it that way, but, on the other hand, you can't

control your feelings.

I mean, you are who you are, I guess, and if you think that you may be biased in some way, you're the only one who can tell me that. I'm not trying to talk you out of it, I'm just trying to make sure we're on the same page.

THE JUROR: I can't guarantee. I don't know what's going to be said during the trial that may impact that.

THE COURT: All right. I guess I'm not going to try to talk you out of it, so I'm going to let you go, Mr. Green.

11:40AM Next. You're Ms. Sonia, Number 52.

THE JUROR: I'm in nursing school full time, and I have clinician calls twice a week, I have finals coming up in two weeks, and I just don't know how that would work out with school.

THE COURT: Okay. So you're a full-time day student in nursing school?

THE JUROR: Yes.

THE COURT: Meaning five days a week?

THE JUROR: Yes.

11:40AM THE COURT: When are your tests or finals?

THE JUROR: In two weeks.

THE COURT: In two weeks. Okay. I think I need to let you go then. Thank you.

Next. Mr. Alcantara, Number 9. Yes, sir.

THE JUROR: I just started working at a new position

this week, and I'm going to be in training the whole month so I'm not sure how that's going to affect my work.

THE COURT: Okay. You're working at Tufts Health Plan?

THE JUROR: Correct.

THE COURT: Where do you physically work?

THE JUROR: I'm now working in the office because I started a new position.

THE COURT: Which office?

11:41AM THE JUROR: In Watertown. I'm living there now.

THE COURT: All right. I'm going to leave you on for now. Tufts Health Plan is a big organization. They're used to this. People go on jury duty all the time.

THE JUROR: It's because of the training, I'm in a new role.

THE COURT: Actually let me talk to the lawyers for just a second. Step away. Do you want me to do something different, drop him, let him go?

MR. LAUER: No, I mean it's Tufts Health Plan. I 11:42AM would think arrangements could be made.

MR. VARGHESE: That's my reaction.

THE COURT: So I think this is going to work out fine, but if you have any trouble with them, you need to let me know because sometimes we can do things, you know, they're not allowed to give you a hard time. I don't think they will about

jury duty, but just in case, if you wind up on the jury and you've got some difficulties at work, let us know so we can try to do something about it.

THE JUROR: Okay.

THE COURT: I can't do anything unless you tell me.

THE JUROR: Okay.

THE COURT: Also, we're going to have four alternates, and so if this doesn't work out for one reason or another, we'll have some flexibility.

11:43AM THE JUROR: Okay.

THE COURT: Hopefully to replace jurors if we need to.

THE JUROR: Okay, sounds good.

THE COURT: Next. Number 60, Mr. Lopes. Yes, sir.

THE JUROR: So I working for a cell phone company. We have a slated release for May 5th, and I'm one of the head communications that runs the testing on the account, and I'm working weekends, and so as a juror, I'd have to also go after work and work weekends.

THE COURT: And you say May 5th is when it's supposed

11:44AM to be released?

THE JUROR: Correct.

THE COURT: And where do you physically work?

THE JUROR: Waltham.

THE COURT: You live in Framingham?

THE JUROR: Yeah, I live in Framingham.

THE COURT: Here's what I'm going to do with you. I'm going to drop you to the end of the list. That means that it makes it less likely that you'll be picked. I can't make any promises.

THE JUROR: Sure.

THE COURT: I've got a number of people in your similar types of position that have a work issue.

THE JUROR: Sure.

THE COURT: But we'll see how it goes, and I'm at 11:44AM least reducing the chance you'll be picked, and I may ask you some questions at the end depending on how this plays out.

THE JUROR: Sure.

THE COURT: Thank you.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: How are you doing, your Honor?

THE COURT: Mr. Blair, Number 51. Yes, sir.

THE JUROR: I know I'm a few steps behind, but today I'm currently under meds. I have gout, and I brought my meds. 11:45AM with me, and also for March 18th, I'm involved with a Billiards Expo in Philadelphia. I'm taking off March 18th. I won't be back until like April 14th.

THE COURT: March 18th to April 14th?

THE JUROR: Yes.

THE COURT: What is Billiards Expo?

THE JUROR: It's the Super Billiards Expo.

The COURT: Are you attending, participating?

THE JUROR: I help set up, I also participate, and I'm one of the top amateurs in New England so I'm in a tournament that's paid for. There's three different ones down there. I'm paid on all of them.

THE COURT: Okay. All right. I'm going to let you go.

THE JUROR: Okay.

11:46AM THE COURT: Next.

THE JUROR: Good morning.

THE COURT: Hi. Mr. Orlov, 34. Yes, sir.

THE JUROR: I just want to ask you just to make sure you said four to six weeks we have to be here like every day?

THE COURT: Yes. There's two days at the end of March where I have to go to Washington, but basically Monday to Friday.

THE JUROR: I have a few things. We have little kids, one and four, and I'm usually the one who drops them off at the day care. My wife leaves early every day five days a week, and I usually pick them up, and another reason, I'm the owner of a construction company on the Cape.

11:46AM I have 12 guys working for me, so I can be here some of the days, but sometimes I have to be on the phone. I'm basically a link between the customers, the people, and just to

make sure everybody. That's a lot of time for me to be without, you know, my other job site. It's the busiest time of year in the springtime.

THE COURT: What does your wife do?

THE JUROR: She works at the office, like bookkeeping and stuff. The work problem -- we can figure out the kids probably possibly, but the work, I'm not sure if I can.

THE COURT: You live in Hyannis?

THE JUROR: Yes, Hyannis.

11:47AM THE COURT: I think if you were closer to Boston, I might keep you on, but since you are in Hyannis, I'll let you go.

Next.

THE JUROR: 22.

THE COURT: Number 22. Mr. Brown. Yes, sir, you're Mr. Brown?

THE JUROR: Yes.

THE COURT: What's your issue?

THE JUROR: I have to attend a meeting in St. Martin 11:48AM on April 3rd because I belong to a foundation, and I have property on the island, and the meeting is in reference to the property.

THE COURT: Okay.

THE JUROR: It's a week to get down and back.

THE COURT: And what exactly does the meeting concern

about the property?

THE JUROR: The property is we bought it years ago, and it's in the process of being held up for the building, and so these meetings determine whether we continue building or we have to stay on hold until they decide.

THE COURT: Okay. Is this something that your spouse or someone else could attend for you?

THE JUROR: She is coming, both of us are going, and we already bought the tickets.

11:49AM THE COURT: Okay. All right. What I'm going to do, Mr. Brown, is I'm going to drop you to the end of the list. What that means, it makes it less likely that you'll be picked.

THE JUROR: Excuse me.

THE COURT: I'm going to put you at the end of the list, which makes it less likely that you'll be picked. I can't make any promises. I may have to revisit this.

THE JUROR: If I get picked, what do I do with the tickets and stuff?

THE COURT: We'll talk about that again if you do wind 11:49AM up getting picked. What I'm doing right now is reducing the chance.

THE JUROR: Okay. So I go sit down?

THE COURT: Go sit down.

THE JUROR: All right.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: All right. Thank you again for your patience, ladies and gentlemen. I'm going to ask you some questions now about law enforcement officers or the law enforcement system. I'm going to ask about connections to law enforcement. I expect that more than one of you are going to raise your hand. What I'm going to ask is a follow-up if you raise your hand is the nature of any relationship you might have and whether that relationship might interfere with your ability to be a fair and impartial juror in this case.

11:50AM Again, what matters most is whether you can be fair. I'm concerned about bias or prejudice. Sometimes people have strong feelings about law enforcement that might affect their ability to be fair to both sides.

An individual law enforcement officer might or might not tell the truth in a particular case. That's up to the jury to decide, but there are people who favor law enforcement officers who have trouble believing that someone in law enforcement might lie, and there's people who don't like law enforcement officers and have trouble that they could tell the truth.

11:51AM In other words, some people have preconceived ideas that might affect their view of the evidence instead of listening carefully and evaluating each witness on his or her merits, and it would be unfair, obviously, if any of the jurors who decided this case had a bias either in favor of law

enforcement or against it.

Again, the case has to be decided according to the evidence and not based on prejudice. So with that as an introduction, let me ask some questions. Have you or any member of your immediate family ever been employed by the Federal Bureau of Investigation or the Department of Homeland Security or any other federal law enforcement agency? I'll get to state and local in a moment, but any federal law enforcement agency. Okay. Let me see you.

11:52AM (THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: 49, Ms. Nordeen. Okay. It looks like you work for NOAA?

THE JUROR: So my brother does. Well, he just retired, federal law enforcement for the Park Service and the Forest Service.

THE COURT: Okay. And is there anything about any of that connection, either your employment or his that would affect your aim to be a fair juror in the trial of this case?

THE JUROR: No.

11:53AM THE COURT: Thank you. Next. You are Number 55, Ms. Zapata.

THE JUROR: Yes, my husband is a police officer at the Federal Reserve Bank in Boston.

THE COURT: Okay.

THE JUROR: And I work for the trial court.

THE COURT: Okay.
THE JUROR: In Stoughton.
THE COURT: All right. Is that the district court?
THE JUROR: District court.
THE COURT: And you're an operations supervisor there?
THE JUROR: Yes.
THE COURT: Is there anything about any of that, either your husband's work or your own, that would affect your ability to be a fair juror in the trial of this case?
11:53AM THE JUROR: No.
THE COURT: Thank you. Next.
THE JUROR: Hello.
THE COURT: You're Lynette Berube, 47?
THE JUROR: Berube, kind of close.
THE COURT: Okay. Yes.
THE JUROR: I worked for the U.S. Border Patrol in a clerical position in 1989 to '91.
THE COURT: You must have been about three years old, right?
11:54AM THE JUROR: Yes, exactly.
THE COURT: Okay. Where was that?
THE JUROR: Tonawanda, New York.
THE COURT: Basically Buffalo?
THE JUROR: Yeah.
THE COURT: And is there anything about that

experience or connection or relationship that would affect your ability to be fair in the trial of this case?

THE JUROR: I don't think so.

THE COURT: Are you confident you can be fair to both sides?

THE JUROR: Uh-hum.

THE COURT: You have to answer yes or no.

THE JUROR: Yes.

THE COURT: I'm about to ask about connections to

11:54AM immigration officials, you know, whether it's Border Patrol or or ICE. Do you have any connections or relationships there?

THE JUROR: I do not.

THE COURT: Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: Ladies and gentlemen, have you or any member of your immediate family or any close friends ever been employed by a federal immigration or border agency such as United States Customs and Border Protection or ICE, Immigration and Customs Enforcement or the Border Patrol or CIS? Okay.

11:55AM I'll see you.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: Number 60, Mr. Lopes. Yes, sir.

THE JUROR: I have a friend from high school who was employed by the Border Patrol.

THE COURT: Whereabouts?

THE JUROR: I don't remember.

THE COURT: Okay.

THE JUROR: His name is Adam Brookly.

THE COURT: Okay. And is he a close friend?

THE JUROR: Yes.

THE COURT: And does he work in the Boston area?

THE JUROR: Yes.

THE COURT: Okay. And is there anything about that relationship or connection that would affect your ability to be a fair juror?

11:56AM

THE JUROR: No.

THE COURT: Are you confident you can be fair to both sides?

THE JUROR: Yes.

THE COURT: Okay. Next.

THE JUROR: 35 again.

THE COURT: 35. Mr. Girardi.

THE JUROR: Yes, sir. My daughter just accepted an offer of employment for DHS in Chicago.

11:56AM

THE COURT: Okay.

THE JUROR: As an immigration services officer.

THE COURT: Okay.

THE JUROR: She is in the process of getting background cleared and all that kind of stuff, so she's accepted but she's not earning money yet.

THE COURT: Hopefully she'll be able to get through security after with her parents. That was a joke.

THE JUROR: Yes, I got you.

THE COURT: Is there anything about that relationship or connection that would affect your ability to be fair in the trial of this case?

THE JUROR: I don't think so.

THE COURT: Are you confident you can be fair to both sides?

11:57AM THE JUROR: Yes.

THE COURT: All right, thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: All right. I asked about federal law enforcement. Now let me ask have you or any member of your immediate family or any close friend ever been employed by a state or local law enforcement agency, such as the Massachusetts State Police or any local PD? All right. Let me see you one-by-one.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

11:57AM THE JUROR: 59.

THE COURT: Mr. Welch, 59. Yes, sir.

THE JUROR: My brother-in-law is a cop in Concord, New Hampshire.

THE COURT: Okay. Patrolman?

THE JUROR: Detective.

THE COURT: And is there anything about that connection or relationship that would affect your ability to be fair in the trial of this case?

THE JUROR: No.

THE COURT: Okay. Thank you. Next. Hi, what's your name and number?

THE JUROR: I'm sorry, 42, Karen Devine.

THE COURT: Karen Devine, 42, yes.

THE JUROR: My husband is a police officer.

11:58AM THE COURT: Whereabouts?

THE JUROR: In Brockton.

THE COURT: Patrolman?

THE JUROR: Detective.

THE COURT: Detective. Is there anything about that connection or relationship that would affect your ability to be fair?

THE JUROR: No, I don't think so.

THE COURT: Okay. Are you confident you can be fair to both sides?

11:58AM THE JUROR: Yes.

THE COURT: Okay. Thank you. Next. Hi, what's your name and number?

THE JUROR: Susan McGilvray-Rivet.

THE COURT: Do you remember your number?

THE JUROR: Yes, 36.

THE COURT: 36. There you are. Okay.

THE JUROR: My brother-in-law is a retired police officer, and my nephew is a police officer.

THE COURT: Okay. Whereabouts?

THE JUROR: My brother-in-law worked in Lawrence, and my nephew works in Salisbury.

THE COURT: Salisbury?

THE JUROR: Yes.

THE COURT: Is there anything about either of those connections or relationships that would affect your ability to be a fair juror in the trial of this case?

11:59AM

THE JUROR: I don't believe so.

THE COURT: Are you confident you can be fair to both sides?

THE JUROR: I believe so.

THE COURT: Okay. Thank you. Next. Number 5. Mr. Gillespie. Yes, sir.

THE JUROR: My father is a retired police chief, and my brother is on the Boston Police force.

12:00PM

THE COURT: Okay. Is your brother a patrolman?

THE JUROR: Yes.

THE COURT: And is there anything about those connections or relationships that would affect your ability to be a fair juror in the trial of this case?

THE JUROR: No, I don't think so.

THE COURT: Thank you.

THE JUROR: You're welcome.

THE COURT: Number 39. Ms. Hinchey.

THE JUROR: Yes, I have a nephew that's a Medfield police officer, and he worked for -- he was a corrections officer before that.

THE COURT: Okay. And a patrolman?

THE JUROR: Yes.

THE COURT: And is there anything about that connection or relationship that would affect your ability to be fair?

12:01PM

THE JUROR: No.

THE COURT: All right. Thank you. Next. Mr. Gaffey. Number 58. Yes, sir.

THE JUROR: Brother, a retired Boston police officer.

THE COURT: Okay. And what kind of work did he do? Was he a patrolman?

THE JUROR: He was a sergeant.

THE COURT: Sergeant, okay. Is there anything about that connection or relationship that would affect your ability to be fair?

12:01PM

THE JUROR: No.

THE COURT: Okay. Thank you. Next.

THE JUROR: How are we doing again?

THE COURT: I'm sorry, your name and number.

THE JUROR: Number 16, Brian Ross.

THE COURT: Yes. Okay.

THE JUROR: My brother is the Chief of Norwell, Mass., I have a nephew in the Hingham Police Department, and I also have a nephew in the Norwell Police Department.

THE COURT: So one nephew in Hingham and one in Norwell?

THE JUROR: Yes.

THE COURT: And is there anything about those connections or relationships that would affect your ability to be fair in the trial of this case?

THE JUROR: No.

THE COURT: Okay. Thank you, sir.

THE JUROR: Carol Berna, Number 30.

THE COURT: Okay. Yes, okay.

THE JUROR: So my children's father is a retired Mass. State Police captain.

THE COURT: Okay.

THE JUROR: Do you want the local now or should I get in line again?

THE COURT: What barracks did he work out of?

THE JUROR: Mostly Plymouth CPAC.

THE COURT: Okay. And then you have local police connections?

THE JUROR: My son is an active officer.

THE COURT: Where?

THE JUROR: In Kingston.

THE COURT: Okay.

THE JUROR: And I have two recently retired brothers that were Weymouth police officers.

THE COURT: Okay.

THE JUROR: I think that's it.

THE COURT: Okay. And is there anything about those connections or relationships that would affect your ability to be fair as a juror in this case?

12:03PM

THE JUROR: I don't think so. I don't think so. I don't know what would be coming up. I tend to side with the police if it's, you know, they make too much money, and they say no, they don't.

THE COURT: That one I may agree with you on, but really, you know, it's, like I said, if you think a policeman, for example, is more likely to tell the truth than the ordinary person, that could be an issue because you have to take each one of these people as they come, right, some people tell the truth, some people don't, and it's for the jury to decide, but you're the only one that can tell me whether you have a bias. I can't look inside your head.

12:04PM

THE JUROR: It doesn't seem like it would be for this case, even though I wish I could say yes.

THE COURT: Well, but it sounds like you at least have

some doubt.

THE JUROR: No, I think I'd be fair.

THE COURT: I have to rely on what you tell me and you being honest, okay. Again, you know, the defendant's on trial, he's entitled to 12 people that are going to listen to everybody, whether it's somebody from rural Africa or a law enforcement officer from the United States and just listen to what they have to say and either say I believe that or I don't believe that, and, you know, to do it fairly as if you,
12:05PM yourself, or a loved one were on trial, that's all we're asking for.

You are who you are, your background is your background, and if you have doubts, tell me, and if you're confident, tell me that.

THE JUROR: No, I think -- I don't have any doubts.

THE COURT: Okay. All right. I'm going to leave you on, Ms. Berna, but if you're sitting there and you change your mind, raise your hand, and I'll see you again. I just want to make sure. Thank you.

12:05PM Next.

THE JUROR: Hi.

THE COURT: Number 45, Ms. Daly.

THE JUROR: Yes.

THE COURT: Yes.

THE JUROR: I volunteer through NEMLEC, Northeast

Massachusetts Law Enforcement Agency. I'm on a team called the Stars Team. We're a school response crisis team that responds to schools that have tragedies, police officers and firefighters and counselors.

THE COURT: And is there anything about that relationship, connection that would make it difficult for you to serve as a fair juror in the trial of this case or otherwise affect your service?

THE JUROR: I don't think so.

12:06PM THE COURT: Are you confident you can be fair to both sides?

THE JUROR: Yeah, I think so.

THE COURT: Okay. I mean, I can't look inside your head.

THE JUROR: I know.

THE COURT: You're the only one that tell me.

THE JUROR: I know. I know. I think there are good and bad people in all fields.

THE COURT: As indeed there are, and, you know, again, 12:06PM we need 12 people who are just going to listen to it.

THE JUROR: Right.

THE COURT: And make their best judgment.

THE JUROR: Right.

THE COURT: In good faith and without bias. Are you confident you can do that? You don't have to erase your

experience, but you have to be fair.

THE JUROR: Right, right. I'm having a hard time with the whole -- just understanding what possibly he could have done in Rwanda.

THE COURT: That's sort of the whole point of the trial.

THE JUROR: I know, it is.

THE COURT: It isn't sort of the whole point, it is the whole point, whether he told the truth about it.

12:07PM THE JUROR: But in terms of law enforcement, I mean.

THE COURT: I mean, this could be if it were a bank robbery case or a drug dealer or anything, again, you just listen to the evidence, is this person telling the truth or not or somewhere in between or whatever.

THE JUROR: Right, right.

THE COURT: And I just need confidence, I need confidence that you are confident you can be fair.

THE JUROR: I mean, I think I can be.

THE COURT: Here's what I'm going to do. I'm going to

12:07PM leave you on. You're at the end of the list, anyway. If you're sitting over there and you have something else you want to raise with me or you're not so confident, raise your hand, and I want to talk to you at that point.

THE JUROR: All right. Thank you.

THE COURT: Next.

THE JUROR: Hi, Number 14, Janet O'Leary.
THE COURT: 14, Ms. O'Leary.
THE JUROR: I have three brothers from Brookline, two are retired, and one is still employed, Brookline Police.
THE COURT: Okay. All patrolmen?
THE JUROR: Yes. Well, one was chief. They've been retired, yeah.
THE COURT: And you don't look old enough to have a retired brother.
12:08PM THE JUROR: I know, I'm the youngest, I like to tell people that.
THE COURT: Is there anything about those relationships that would affect your ability to be a fair juror in the trial of this case?
THE JUROR: No.
THE COURT: Okay. Thank you. Next.
THE JUROR: Hello.
THE COURT: What's your name?
THE JUROR: Cressida Buonagurio.
12:08PM THE COURT: Number 40.
THE JUROR: He told me to come up just to mention it. My two cousins work for New York Police Department, and my uncle is a retired NYPD.
THE COURT: Okay. And is there anything about those connections or relationships that would affect your ability to

be fair?

THE JUROR: No.

THE COURT: Thank you.

THE JUROR: Thank you.

THE COURT: Next.

THE JUROR: Hello.

THE COURT: Hi.

THE JUROR: 78.

THE COURT: 78. Mr. McGlynn.

12:09PM THE JUROR: Yes. I have a casual friend that's a retired local police officer.

THE COURT: Okay. From where?

THE JUROR: From Weymouth. He shows up in the summer when he wants my tomatoes, that's the only time I see him anymore.

THE COURT: Is there anything about that connection or relationship that would affect your ability to be a fair juror?

THE JUROR: No.

THE COURT: What are you retired from, Mr. McGlynn?

12:10PM THE JUROR: Oh, my last job, courier for a bank, worked for Boston Financial Data Services, Coca-Cola years ago, and it keeps going.

THE COURT: Okay. Thank you. Next. Welcome back Number 60.

THE JUROR: So my best friend since I was little is a

police officer in Cohasset, and my girlfriend works in Boston Probate Juvenile Division.

THE COURT: Okay. And is your friend a patrolman?

THE JUROR: Yes.

THE COURT: And is there anything about either of those relationships or connections that would affect your ability to be fair?

THE JUROR: I don't think so, no.

THE COURT: Okay. Thank you.

12:11PM (SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: All right. Ladies and gentlemen, have you or any member of your immediate family or any close friend ever been employed by a prosecutor's office, a public defender's office, a court, a probation office or a prison or jail?

And some of you have already told me some of these things. You don't need to come up and tell me things you've already told me.

Prosecutor's office, public defender's office, court, probation office, prison or jail? Okay.

12:11PM (THE FOLLOWING OCCURRED AT SIDEBAR:)

THE JUROR: 54.

THE COURT: 54, Ms. Young.

THE JUROR: Yes. My best friend works for the Bureau of Prisons.

THE COURT: Okay. In Boston?

THE JUROR: New York City.
THE COURT: And what does he or she do?
THE JUROR: She is a lawyer.
THE COURT: And is there anything about that relationship or connection that would affect your ability to be fair?
THE JUROR: No.
THE COURT: Okay. Thank you. Next.
THE JUROR: 44.
12:12PM THE COURT: Number 44. Ms. Awah.
THE JUROR: My brother is a corrections officer. He works in Billerica.
THE COURT: I'm sorry, where does he work?
THE JUROR: Billerica.
THE COURT: Is there anything about that connection or relationship that would affect your ability to be a fair juror?
THE JUROR: No.
THE COURT: Thank you. Next.
THE JUROR: Juror Number 50.
12:13PM THE COURT: Juror Number 50. Yes.
THE JUROR: I have a cousin who just finished law school and is working at a law firm somewhere, I'm not exactly sure what she really does, but I know she took her bar exam, passed it, et cetera, et cetera.
THE COURT: Okay. And is there anything about that

relationship or connection that would affect your ability to be fair?

THE JUROR: None at all.

THE COURT: Okay. Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: All right. Do any of you believe that law enforcement officers or other government agents are more likely or less likely to tell the truth than other kind of witnesses just because of the job they hold? In other words, to be clear

12:13PM about it, every witness no matter who that person is should be judged by the jury based on who they are and what they say, but if you believe that someone just because they are a police officer or an agent, they're more likely to tell the truth or less likely to tell the truth, please raise your hand.

All right. I see no hands. Do any of you have any feelings or beliefs about law enforcement or law enforcement officers or other government agents, whether those are positive or negative, that might affect your ability to be a fair and impartial juror in the trial of this case? All right. I see

12:14PM no hands.

Do any of you feel that you or anyone close to you, a family or friend has ever been unfairly treated by the criminal justice system in some way? Okay. Let me see you.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE JUROR: Hello, 75. I have a cousin of mine named

Cesar Jimenez. I think he wrongfully got accused of domestic assault, which I think he's due out soon this summer. That was it.

THE COURT: And do you think that the system treated him wrongfully, I mean, as opposed to his accuser?

THE JUROR: Both, the system, you know, I don't think they did a thorough enough job of looking into the details of the witness, not the witness, the person that got hit or whatever.

12:15PM THE COURT: All right. And, obviously, this case doesn't have anything to do with that, so I just want to make sure is there any reason that might affect your ability to be fair in the trial of this case?

THE JUROR: I think it could because the fact it is law enforcement, it is the government that's involved here, right?

THE COURT: Well, I guess, let me be clear about that. We want people with every kind of experience. We don't want you to erase your experience, but you have to be fair. In 12:16PM other words, you know, there's the fact that your cousin was wrongfully or you think he was wrongfully accused might make you look at the evidence very closely and make sure you know what you're doing before you vote, which is fine and fair, but you can't be biased against the government, if you understand the distinction.

You can't go in with a chip on your shoulder or try to prove a point or get back at people, you have to be fair because whatever happened, it's not the same people, it doesn't have anything to do with this is just the point. You don't have to pretend it didn't exist, that's part of your experience, but you have to be fair, and if, you know, if you're struggling or you think you might struggle to do that, that's fine, you just tell me.

THE JUROR: I think I would.

12:17PM THE COURT: You think that's true?

THE JUROR: Yes.

THE COURT: I'm going to have to let you go, Mr. Perez, thank you, and good luck with your mother.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: Ladies and gentlemen, have any of you, any of you or any member of your immediate family or close friend ever been accused or convicted of a crime? Okay. Let me see you.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

12:17PM THE COURT: Ms. Nordeen, 49.

THE JUROR: My father was a sex offender.

THE COURT: Okay. And do you think he was treated fairly by the criminal justice system?

THE JUROR: I was only in school during most of it, so I wasn't actually aware of the details or any of the conviction

or anything.

THE COURT: Okay. I'm sure that was not a happy experience, but is there anything about that that would affect your ability to be fair in this case?

THE JUROR: I don't think so.

THE COURT: Okay. Thank you. Next.

THE JUROR: Number 50.

THE COURT: Yes, Mr. El-Lakis, Number 50, yes.

THE JUROR: My brother was arrested for possession and distribution of marijuana.

12:18PM

THE COURT: Okay. When was that?

THE JUROR: Some time I believe 2016-ish.

THE COURT: In Massachusetts?

THE JUROR: Yes.

THE COURT: How did that case come out?

THE JUROR: He was proven guilty, and he went to jail for a couple months, I'm not sure how long.

THE COURT: Do you feel he was treated fairly? You have to answer yes or no for the record.

12:19PM

THE JUROR: Yes.

THE COURT: Is there anything that would affect your ability to be a fair juror here?

THE JUROR: No.

THE COURT: Thank you. Next.

THE JUROR: 77.

THE COURT: Okay. Mr. Dyer.

THE JUROR: Dyer. Two nephews, one was arrested, convicted, spent prison time in Carson City, Nevada, also locally in New Hampshire correctional facilities, I'm not sure which one.

THE COURT: Okay.

THE JUROR: The other nephew spent I think it was two years, two and a half years in one of the state prisons. I don't have the details exactly.

12:20PM THE COURT: Okay. And do you feel they were treated fairly by the criminal justice system?

THE JUROR: I think they both should have been locked up for another five years. So is that fair or not?

THE COURT: Well --

THE JUROR: Well, they were treated more than generously, I would put it that way.

THE COURT: All right. And is there anything about that experience that would affect your ability to be fair?

THE JUROR: No, not really, no. One of those is the 12:20PM guys who should be taking my sister-in-law to cancer treatments.

THE COURT: Thank you.

THE JUROR: Thank you.

THE COURT: Next. Mr. Alcantara, Number 9. Yes, sir.

THE JUROR: So my cousin got arrested for domestic

violence, and my brother-in-law for I think prostitution.

THE COURT: Okay. Do you think they were treated fairly by the criminal justice system?

THE JUROR: I'm not sure.

THE COURT: Is there anything about that situation that would affect your ability to be fair?

THE JUROR: No.

THE COURT: Thank you.

Next.

12:21PM THE JUROR: 23, Mary Alves. My husband was accused of domestic abuse. He had a restraining order taken out on him, which was easy to get, but he was never charged.

THE COURT: How long ago was that?

THE JUROR: That would have been about five or six years ago.

THE COURT: And do you think he was treated fairly by the system as opposed to his accuser?

THE JUROR: I know from him and from other people near him they felt that the local police didn't treat him fairly.

12:22PM THE COURT: Okay. And is there anything about that experience that would affect your ability to be fair?

THE JUROR: I don't think so.

THE COURT: Okay. Again, you don't have to erase your experience, we want people with all kinds of backgrounds and whatnot but you just need to make sure everyone is fair.

THE JUROR: Thank you.

THE COURT: Thanks.

Next. Mr. Brown, Number 22. Yes, sir.

THE JUROR: At my age, it's pretty hard not to, so I'll give you the drought. They accused me of not paying for a car, which we did back in the '60s. I think I was accompanied with somebody using their husband's credit card and shopping evidently during a divorce, and the last one, I supposedly threatened somebody to kill them. I'm going to break it all down, I possessed a CCW permit that's current, so I'm assuming all of them didn't mean anything.

12:23PM

THE COURT: Do you feel you were treated fairly by the criminal justice system?

THE JUROR: Excuse me.

THE COURT: Do you feel you were treated fairly?

THE JUROR: Oh, yeah, yeah.

THE COURT: Is there anything about those experiences that would affect your ability to be fair?

THE JUROR: No, not at all.

12:23PM

THE COURT: Okay. Thank you.

THE JUROR: But I had to be honest.

THE COURT: That's what I want.

THE JUROR: Okay.

THE COURT: Next. Hi, Ms. Bowes, Number 21. Okay.

THE JUROR: Does it have to be immediate family or in

your family?

THE COURT: What have you got?

THE JUROR: Cousin. He's in prison for murder, but it was a long time ago.

THE COURT: Okay. Do you think he was treated fairly?

THE JUROR: I don't know because his family doesn't, but I wasn't there.

THE COURT: And is there anything about that experience that would affect your ability to be a fair juror in 12:24PM the trial of this case?

THE JUROR: For this case, no.

THE COURT: Okay. Thank you.

Next. Mr. Norvish, 31. Yes, sir.

THE JUROR: So this is for like if your brother or family was arrested or sent to prison?

THE COURT: Anybody close to you accused of a crime.

THE JUROR: My brother was accused of strangulation, and my cousin was sent to prison because I don't remember, she was a drug dealer.

12:24PM THE COURT: And the thing with your brother, when did that happen?

THE JUROR: Probably about three years ago.

THE COURT: And how did it come out? How did it turn out?

THE JUROR: He got put on parole, but for the police

officers they never showed up.

THE COURT: Okay.

THE JUROR: Also, because when he got arrested, the officers are supposed to tell you your rights. If they put you in custody and they want to use a later statement, they're supposed to read you your rights. That never happened.

THE COURT: Is there anything about that experience or either of those experiences that would affect your experience to be a fair juror in the trial?

12:25PM THE JUROR: No.

THE COURT: Thank you.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: All right. Ladies and gentlemen, the defendant has a constitutional right not to testify in this case, and no inference of guilt or anything else may be drawn from the fact he does not testify. Drawing that inference would be wrong, indeed, would violate your oath as a juror.

Are there any of you that might have trouble accepting that basic principle concerning that defendant's right not to testify and might hold it against the defendant if he does not 12:26PM testify? All right. I see no hands.

The fact that the defendant has been charged with a crime is not evidence that he's guilty of that crime. He is not presumed guilty, on the contrary, he's presumed innocent. The government has the burden of proving his guilt beyond a

reasonable doubt.

Are there any of you that might have difficulty accepting that principle concerning the presumption of innocence and the burden of proof? All right. I see no hands.

All right. Again, the jury must decide this case based solely on the evidence presented in this courtroom. Are there any of you who might have trouble accepting that principle and might decide the case based on something other than the evidence? I see no hands.

12:27PM Do any of you have any political or religious or ethical beliefs that might affect you or affect your ability to be fair? I don't want to know your politics or your religious or personal beliefs unless there's something about them that might somehow interfere with your ability to follow the law as I instruct you? All right. I see no hands.

Are you aware of any beliefs or feelings that would prevent you from completely and honestly applying the law to the facts as you find them? I see no hands.

Do you know of any reason that has not been raised why 12:27PM you cannot sit as a fair and impartial juror in the trial of this case?

Is there anything I have not asked you about that you would like to raise with me before we go any further, anything at all that might affect your service?

(No response)

Okay. Counsel.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: Anything else on the cause questions? Anything from the government?

MR. VARGHESE: The issue with the witness.

THE COURT: Oh, I forget a witness, right? I skipped over the witness. Anything else?

MR. VARGHESE: That's it.

MR. WATKINS: May we have one moment.

12:28PM THE COURT: I'm going to ask this question.

MR. VARGHESE: It's a professor in London, it's a common name.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: Ladies and gentlemen, it was pointed out to me when I went over the long list of witnesses, I skipped a name. It's someone who's at the School of Oriental and African Studies in England whose name is Dr. Phil Clark again in London, University of London. Does anyone have any connection with that person?

(No response)

Okay. Thank you.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: All set?

MR. LAUER: I think we're all set.

THE COURT: Okay. So we're going to put the first 16

remaining people in the box. I won't go over the names to save time, but if you think we got it wrong, obviously, let me know.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: All right. What we're going to do now is the clerk, Ms. Pezzarossi, is going to call out 16 names. The first person should sit in the seat closest to me, that's seat 1. We'll go eight across the front, and the ninth juror will be behind Number 1, and we'll go across the back, and then I have some follow-up questions for the people who wind up in the box.

12:30PM

THE CLERK: Could I please have Number Juror Number 2, Jamiel Morgan, please take Seat Number 1; Juror Number 3, and I apologize if I screw this one up, Srivastava Shilpi, please take Seat Number 2; Juror Number 5, Glenn Gillespie, please take Seat Number 5, I mean, Seat Number 3, Juror Number 5; Juror Number 8, Dinis Fernando, please take Seat Number 4; Juror Number 9, Carlos Alcantara, please take Seat Number 5; Juror Number 10, Danie Pierre-Louis, please take Seat Number 6; Juror Number 14, Janet O'Leary, please take Seat Number 7; Juror Number 15, David Bryan, please take Seat Number 8, Juror Number 16, Brian Ross, please take Seat Number 9 directly behind seat Number 1; Juror Number 18, Danillo Silva, please take seat Number 10; Juror Number 21, Teresa Bowes, please take Seat Number 11; Juror Number 23, Mary Alves, please take Seat 12; Juror Number 24, Thomas Stokes, please take Seat 13;

12:31PM

Juror Number 26, Sara Donovan, please take Seat Number 14; Juror Number 28, David Troutman, please take Seat Number 15; and Juror Number 30, Carol Berna, please take Seat Number 16.

THE COURT: All right. I'm going to ask a couple follow-up questions to the 16 jurors in the box. I'm going to ask some of you whether you're married. I'm not doing that to pry, but if you do have a spouse, the parties are entitled to know what your spouse does for a living. That's the only reason I'm asking.

12:33PM Ms. Jamiel, are you married?

THE JUROR: No.

THE COURT: Mr. Gillespie?

THE JUROR: No.

THE COURT: Mr. Alcantara, are you married?

THE JUROR: No.

THE COURT: Ms. Pierre-Louis, yes, you are?

THE JUROR: Yes.

THE COURT: What does your spouse do?

THE JUROR: He works at Verizon.

12:33PM THE COURT: For Verizon. Okay. Mr. Bryan, are you married?

THE JUROR: Yes.

THE COURT: What does your spouse do?

THE JUROR: She's currently on a void.

THE COURT: What was her last job?

THE JUROR: Working for a wire supplier.

THE COURT: Mr. Ross, are you married?

THE JUROR: Single.

THE COURT: Mr. Silva?

THE JUROR: No.

THE COURT: Not married. Mr. Stokes, are you married?

THE JUROR: No.

THE COURT: And Ms. Berna, are you married?

THE JUROR: No.

12:34PM THE COURT: All right. Let me ask the 16 of you, have any of you ever served on any kind of jury before, state or federal, criminal or civil, regular jury, grand jury? I'm going to go down the line. Tell me basically where it was and what kind of case it was. We'll start in the front row. Yes.

THE JUROR: It was in Boston, it was a criminal trial. I want to say it was back in the '90s.

THE COURT: Do you remember what kind of case it was?

THE JUROR: It was a murder trial.

THE COURT: Yes.

12:35PM THE JUROR: Civil case a long time ago, probably the '90s, someone injured themselves on a job work site.

THE COURT: Yes.

THE JUROR: It was Brockton Superior Court. It was an assault and battery case.

THE COURT: How long ago, ballpark?

THE JUROR: It was about a year ago.

THE COURT: Okay. All right. I'm going to give the lawyers a little bit of time here. What we're going to do, I doubt we're going to get this whole thing done by one, and we're going to break for lunch at one o'clock. I'm sorry. If we're close, we might just bang through, but we may not get it done in time.

All right. Counsel.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

12:41PM THE COURT: All right. So this is Round 1 of peremptory challenges. The government has 8 challenges, the defense has 12. They'll be exercised one-by-one in rounds. The government goes first in the first round, defendants first in the second round, and no backstrikes, meaning you have one opportunity to pass on a juror.

So the government.

MR. VARGHESE: First strike is Seat Number 5, Juror Number 9.

THE COURT: Seat 5, Juror 9.

12:42PM Defense.

MR. LAUER: We're content.

THE COURT: Okay.

MR. VARGHESE: On the second strike is Seat Number 12, Juror Number 23.

THE COURT: Seat 12, Juror 23. That is Ms. Alves.

Okay.

MR. VARGHESE: Seat 13, Juror Number 24.

THE COURT: That's Mr. Stokes. That's it? So we will replace those jurors with 31, 36 and 39. Okay.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE CLERK: Could I have please have Juror 31, Kyle Norvish, please take Seat Number 5 in the first row; Juror Number 36, Susan McGilvray-Rivet, please take Seat Number 12 in the back row; and Juror 39, Ellen Hinchey, please take Seat Number 13.

12:44PM

THE COURT: Mr. Norvish in Seat 31, are you married?

THE JUROR: No.

THE COURT: The three newly seated jurors, have any of you ever served on any kind of jury before, state, federal, criminal, civil? No, okay.

THE JUROR: I am married.

THE COURT: I think I knew that. If you say you're married, it's on the form. Sometimes it says single or unknown.

12:47PM

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: All right. This is Round 2. The defense has all 12 challenges left, the government has 5. Mr. Lauer.

MR. LAUER: We would strike 31.

THE CLERK: Seat 5, Juror 31.

THE COURT: Okay. The government.

MR. VARGHESE: Nothing.
THE COURT: Anything further from the defense?
MR. LAUER: We would strike 39.
THE CLERK: Seat 13, Juror 39.
THE COURT: All set?
MR. LAUER: Yes.
THE COURT: Okay. Just, again, to be clear, we're deep into the alternates because we're going to replace two people, so we'll go over it later, but so we're clear, we have our 12 jurors and our first two alternates already.
12:48PM
(SIDEBAR CONFERENCE WAS CONCLUDED.)
THE CLERK: Juror Number 40, Cressida Buonagurio, please take Seat Number 5 in the first row; and Juror 41, James Colter, please take Seat Number 13 in the back row.
THE COURT: All right. Ms. Buonagurio, are you married?
THE JUROR: Yes.
THE COURT: What does your husband do?
THE JUROR: He's self-employed, a recycling company and a beverage distribution company.
12:49PM
THE COURT: And Mr. Colter, are you married?
THE JUROR: No.
THE COURT: Have either of the two of you ever served on a jury of any kind?
THE JUROR: No.

THE JUROR: Yes. It was in Lawrence, probably in the '90s, a drug case.

THE COURT: Okay.

THE JUROR: I misunderstood one of your questions, and I didn't respond.

THE COURT: Why don't you come over to sidebar and we'll talk about it.

THE JUROR: Okay.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

12:50PM THE COURT: What did you want to take up?

THE JUROR: I think you asked if I've ever been accused of breaking the law.

THE COURT: Yes.

THE JUROR: In '87, I think it was in New Hampshire, the street signs were down, and I went up a one-way street, and I was written up for DUI.

THE COURT: Okay.

THE JUROR: And the Judge reversed it because she saw that the signs were down, and many people were going up that one-way street.

12:50PM

THE COURT: Okay.

THE JUROR: So I don't know if I misunderstood the question or not.

THE COURT: No, that's fine. Do you feel you were treated fairly by the criminal justice system?

THE JUROR: The Judge corrected what was wrong. I didn't at the beginning, so it resolved itself.
THE COURT: Do you feel you can be a fair juror in the trial of this case?
THE JUROR: Yeah.
THE COURT: Okay. Fair to both sides?
THE JUROR: Yes.
THE COURT: Okay. Thank you.
THE JUROR: Okay. Thank you.
12:51PM (SIDEBAR CONFERENCE WAS CONCLUDED)
(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)
THE COURT: This is Round 3. Defense goes first, the government has left, the defendant has 10 left.
MR. VARGHESE: We would strike 41.
THE COURT: Seat 13, Juror 41. Okay. Anything from the defense?
MR. LAUER: No.
THE COURT: We'll replace him with Ms. Devine.
(SIDEBAR CONFERENCE WAS CONCLUDED.)
12:52PM THE CLERK: Number 42, would you please replace him.
THE COURT: All right. Ms. Devine, have you ever served on a jury before?
THE JUROR: No.
(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)
THE COURT: All right. This is Round 4. Defense goes

first.

MR. LAUER: We would exercise a peremptory challenge.

THE COURT: Okay. Seat 13, Juror 42. I guess we haven't seen Ms. Ferro, so we'll put her in the box.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

THE COURT: Ms. Ferro, are you married?

THE JUROR: No.

THE COURT: And have you ever served on a jury before?

THE JUROR: No.

12:53PM (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: Okay. All right. This is Round 5. The government goes first.

MR. VARGHESE: We'll strike 44.

THE COURT: All right. The defendant or has everyone had a chance to see the next person, Patience Awah, do you know whether you want to exercise a challenge here, either of you, or do you want to see her again?

MR. LAUER: I would like to see her again and confer.

(SIDEBAR CONFERENCE WAS CONCLUDED.)

12:54PM THE CLERK: Could I please have Patience Awah, please take the seat, Juror Number 44.

THE COURT: Ms. Awah, are you married?

THE JUROR: Yes.

THE COURT: What does your spouse do?

THE JUROR: He's unemployed at that moment.

THE COURT: What was his last job?
THE JUROR: Engineer.
THE COURT: Have you ever served on a jury before?
THE JUROR: Civil case in Lowell.
THE COURT: How long ago?
THE JUROR: January.
THE COURT: January, okay.
(THE FOLLOWING OCCURRED AT SIDEBAR:)
THE COURT: It's Round 6.
12:55PM MR. LAUER: No challenges.
THE COURT: This is the fourth alternate, just to be clear.
MR. VARGHESE: We're content, your Honor.
THE COURT: All right. What I think makes sense is swear them in, I've got a 20-minute introduction that I would probably normally give it on Monday. Because it's the weekend, I'm going to bang through that and let everybody go. All right.
(SIDEBAR CONFERENCE WAS CONCLUDED.)
12:57PM THE COURT: Ladies and gentlemen, you are going to be the jury in this case, and so I'll ask you to stand once more and be sworn as the actual jury.
(The jury was sworn.)
THE COURT: All right. Ladies and gentlemen, it's about a minute before one. I have some preliminary

instructions that are probably going to take about 15 minutes, maybe a little more. I think it makes sense to go through them so I can let you go for the day, and if you just bear with me here, so let me do that.

I'm going to start by taking a few minutes to talk about your duties as jurors. I'm also going to give you some brief preliminary jury instructions on the law that you're to follow.

At the end of the trial, I'm going to give you a complete and detailed set of instructions. Those instructions will be in writing. Each of you is going to have your own copy to read along with me as I read them aloud and to take with you into the jury room.

12:59PM

The reason I'm giving you some basic instructions now instead of waiting until the end of the trial is to try to give you a bit of a framework for thinking about the evidence and to help you understand it.

I don't want you to think that these instructions are the only ones that matter or they're somehow more important than the ones that come later. You must apply the instructions I give you at the end of the trial as a whole.

01:01PM

It's your duty to decide from the evidence what the facts are. You and you alone are the judges of the facts. You'll hear the evidence, decide what the facts are, and apply them to the law as I give it to you. You must follow the law

as I explain it whether you agree with it or not.

Sometimes jurors are curious about what I think, whether I think, for example, a defendant is guilty or not or whether I think a particular witness is believable.

My opinion, if I have one, and I will certainly don't have one now, is not relevant. It's your role, not mine to decide those issues. And you should not interpret what I might say or do during the trial as indicating what I think about a witness or what I think your verdict ought to be.

01:02PM Again, this is a criminal case. The defendant is charged with two counts of making a false statement in an immigration document and three counts of perjury. I'll explain to you what that means in more detail later in the case.

The charges against the defendant are contained in a document called an indictment. The indictment simply is an accusation. It's a description of the charges against him, it's not evidence of anything. He has pleaded not guilty to the charges.

Again, he's presumed innocent. The government must 01:02PM prove his guilt beyond a reasonable doubt. The defendant does not have to prove his innocence. He does not have to put on any evidence. He does not have to testify. Those are rights guaranteed by the United States Constitution.

At the end of the trial, you'll be asked to render a verdict of guilty or not guilty on each of those charges. Your

verdict must be unanimous as to each of those charges. In other words, you may convict the defendant on that charge only if every one of you agrees he's guilty beyond a reasonable doubt.

I'm going to give you a brief outline of the charges against the defendant. Again, this is just a thumbnail sketch. At the end of the trial, you'll have a complete description. Again, he's charged with two counts of making a false statement in a document required by federal immigration law.

01:03PM For you to find the defendant guilty, you'll have to be convinced that the government has proved that the defendant made a false statement, that it was made knowingly, in other words, intentionally, not by accident or mistake, that the statement was made under oath, that the statement contains a material fact, and that the statement was made in an application that's required by U.S. immigration laws or regulations.

He's also charged with committing perjury. For you to find him guilty, you must first find that the defendant made a statement or a declaration of some kind, 01:04PM that it was made under the penalties of perjury, that he did it willfully, again, that he did it intentionally, not by mistake or accident, that it again concerned something material, a material fact, and that the time he made that statement, the defendant did not believe that it was true. That's just basically a thumbnail sketch.

Again, I think he's charged with both written perjury and perjury in a document. You'll have detailed instructions on what all this means, but that's just the basic summary of the charges against him, and the instructions you'll get at the end of the case will govern your deliberations.

I've used the word "evidence." I expect that the evidence will include the testimony of witnesses and documents and photographs received as exhibits and any facts on which the parties might have agreed. The evidence consists of all of the 01:05PM testimony, both on direct and cross-examination, and all of the exhibits regardless of who introduced them.

There are rules that control what you may consider as evidence. Sometimes, as I'm sure you know, if a lawyer asks a question or offers something, the other side may object. That means I have to make a ruling. Sometimes I have to do that at the sidebar outside of your hearing. Obviously, I don't keep things from you just to frustrate you, but sometimes I have to discuss things outside of your earshot, and I will do what I can to keep all that to a minimum.

01:06PM Certain things are not evidence. Statements and argument by lawyers are not evidence. The lawyers are not the witnesses. A question by a lawyer standing alone is not evidence. Again, the lawyer is not the witness. It's the question and the answer taken together that are the evidence.

An objection is not evidence. Lawyers have a duty to

object if they think something is improper. If I sustain an objection, if I keep something out, you should not try to guess or speculate what the answer might have been, what the document might have said, or anything like that.

I hope this doesn't happen, but if I have to tell you to disregard something, it's not evidence, and you may not consider it. Anything you might see or hear about this case outside of the courtroom is not evidence. You must decide the case based on what you see and hear in court only.

01:06PM Sometimes evidence may be received for a limited purpose only, that is, you can use it for a particular purpose and not for any purpose. If that happens, I will tell you and explain what you can and can't use it for.

It's your job to decide what testimony you believe and what testimony you do not believe. You may believe everything a witness says or only part of it or none of it. It's entirely up to you.

Now, many people watch television shows or movies about courts or lawyers or the criminal justice system, and 01:07PM sometimes people are affected by that when they serve as jurors, and television shows and movies can create false expectations about real life, how a trial is going to proceed or what the evidence should look like.

You must decide this case based only on the evidence before you and the law as I give it to you. Don't decide the

case even in part on something you saw on TV or in a movie, it's improper and it's unfair.

Let me turn next to the subject of how to conduct yourselves during the trial. We want to make sure the trial is fair, and to ensure that it's fair, we have rules that you have to follow. The first rule is not to talk among yourselves about the case until the end of the case when you go to the jury room to decide on your verdict.

You're going to be together a lot. You should feel

01:08PM free to get to know one another, but you should talk about the Patriots or the Red Sox or the weather or your families or anything other than this case, and it's particularly important that jurors not start to have side discussions, not to pair up, to talk about what a witness just said or what you're thinking because whether you intend it or not, you'll start to influence each other and affect each other's thoughts and conclusions, even if it seems like a casual conversation at the time, so it's important that you wait and make sure everyone hears everything that everybody has to say all at the same time, and

01:08PM that's at the end of the case.

You should not make up your mind what the verdict should be until after you've gone to the jury room and you've had a chance to discuss the case. The evidence has to come in in some order, something has to come first, something has to go last, and it may be that the last question and the last answer

are the most important thing in the trial, so keep an open mind until the end.

Next, do not talk with anyone else about this case until the trial has ended and you've been discharged as jurors. Now, when I say don't talk with anyone else, that includes members of your family, your friends, your roommates. It's the most natural thing in the world when you get home for your families or friends to say what kind of case is it, what do you think, I saw this thing on TV the other day, and blah, blah,
01:09PM blah.

And, again, I'm instructing you that you cannot have those conversations while the trial is going on. Again, no one may intend it, you may not realize it, but your friends and your loved ones are going to have a very strong influence on your opinion, and they may not mean any harm, and you may not mean any harm, but they're not here to see the evidence and to hear my instructions, so you can tell them you're a juror, you can tell them in just very general terms what kind of a case it is, but that's it. You can blame it on me if you want, you can
01:10PM say that the Judge ordered you not to talk about it, and once the case is over, you can talk about anything with anyone that you choose, it's entirely up to you, it's just while the trial is going on.

Next, please do not mention or discuss this case in any way on any social network or any other electronic form,

nothing on Twitter, nothing on Facebook, nothing. This is very important. As I'm sure you know, nowadays people put everything on Facebook or tweet about what happened to them, and you can't do that here.

If you do it and we find out about it, I may to declare a mistrial and start over, and I really don't want to have this trial twice, okay, so it will be a huge waste of time and resources. Please don't do it.

Next, I doubt this will happen, but if anyone 01:11PM approaches you about the case and tries to talk about it, please report that to me immediately.

During the trial, please don't talk to any of the parties or lawyers or witnesses. You really shouldn't even say hello to any of them. It's important not only that you do justice but that you give the appearance of doing justice, and so if someone sees you talking to someone involved in the case, even if you are just waiting for the elevator, you are being polite, you are talking about the Bruins or something, I may have to have hold a hearing and find out what the conversation 01:11PM was and all of that, so please don't do it.

And if one of the lawyers or witnesses passes you in the hall and they don't say anything, they're not being rude, they're following my instructions as well.

I don't know what kind of news coverage, if any, we're going to have, but don't read any news stories about this case

or about anyone involved in it or listen to any radio or TV reports.

If there's something you want to read, you can have a friend set aside an article or have something bookmarked or saved, you can look at it later, but please don't read it during the trial.

Please don't do any research on your own. It's critically important that you not look things up on the Internet. If you think some piece of information is missing,

01:12PM you're not allowed to look it up on your own. That's true even if you think it's harmless, even if you're just curious, even if you're frustrated, you're confused, you can't do it, okay. You can't look up things on the Internet. You have to decide the case based only on the evidence you've been given in this case, and after the case is over, you can look up anything you want.

Please try to be respectful of the Court, please don't bring food or drink into the courtroom, please don't chew gum during the trial, and please try to dress appropriately.

01:13PM During the course of the trial, if you have a problem of some kind, please raise your hand, we'll try to take care of it. Sometimes people mumble, sometimes people block your view, you might need a Kleenex, you might need a glass of water, you might need a bathroom break, things happen, just raise your hand, and we'll try to deal with it.

If we're not in court and you need to communicate with me, please give a signed note to the Court security officer to give to me.

Again, all of those rules are important, they're intended to make sure that the trial is fair, and I instruct you to follow them.

All right. I'm going to permit you to take notes in the case. The clerk will distribute pencils and pads for your use. There will be a number on the cover of the notebook that 01:13PM will be your juror seat number. I want to give you a couple cautions about taking notes.

The first caution is don't allow taking notes to distract you from listening to the testimony. It's important that you observe the witnesses and listen to them, and if you'd rather take no notes at all, that's fine, some people take lots of notes, some people take none, some people just jot down a few things. It's completely up to you.

Please remember not everything that is written down is necessarily what was said. Don't assume when you get back to 01:14PM the jury room that just because it's in somebody's notes that it necessarily took place. Notes are an aid to recollection, nothing more. The fact that it's written down doesn't mean that it's necessarily accurate.

One of the things people tend to do is they tend to write down the question, and they get distracted by that, and

they don't write the answer, so, again, don't assume just because it's written down it's true.

You should take your notebooks with you to the jury room at every recess, you cannot take your notes home or anywhere else outside the courtroom or the jury room. The clerk will collect them at the end of every day and put them in the vault. They will be returned to you the next morning, and when the case is over, your notes will be destroyed, no one but you will ever look at them.

01:14PM All right. As you can see, we have a court reporter who's creating a record of everything that happens in this trial. Sometimes jurors think that they'll have a transcript when they go back to the jury room. That is not true. You will not be given one. There are a number of reasons for that. One of them is strictly practical. Usually there's not time to prepare one.

The Court reporter has a difficult job. It's very time consuming to take a raw record, which is what she's creating, and turn it into a final transcript, so you will not 01:15PM have a transcript, and you should, therefore, listen very carefully and take whatever notes you think may be necessary to help you remember them.

What we're going to do -- actually, let me come back to that. As I indicated, our normal trial day will be from nine in the morning to one in the afternoon. Again, I

explained a little bit why we do that, because people get tired, cases don't really move faster. It's easier on jurors, it's easier on lawyers, and cases tend to drag in the afternoon, but to make sure that that works and that the case doesn't get off track, we need to be disciplined, and I'd like to keep to a tight schedule. I'd like to begin every day at nine o'clock sharp. I don't want to begin at 9:05, 9:02.

That means you need to be here before that to make sure you get here so we can start on time. We'll take a break 01:16PM at eleven. It's a chance to stretch your legs and go to the bathroom, but that's it, and we'll go to one o'clock.

I am going to have an afternoon session. That's this come Tuesday, which is March the 12th. It's to accommodate the schedule of someone who's coming from overseas. It's possible that we may need to do a little bit on the afternoon of the 13th, although I don't know, and I'll let you know, but I expect that that will be rare, and also I have two days in March, I can give you this information later in writing in which I can't be here, March 28th and the 29th.

01:17PM I have business in Washington. I'm about to become Chief Judge of our court, and I have to attend a meeting in Washington those days, so we won't sit that day, and, again, when the time comes for you to deliberate, you should expect to meet all day until you reach a decision. It may not take that long, but you should plan for that possibility.

I hope we'll stay on track. I'm going to ask the lawyers about it basically every day, and if we start falling behind, I'll do what I need to do to get this case on track, but I hope that won't happen.

Unfortunately, we do live in Massachusetts. Winter isn't over yet. It used to be that we just did what the Boston schools did, if they were closed, we were closed, and that created a bunch of problems, sometimes weather is different in different parts of the state, and sometimes the Boston schools 01:18PM close for no reason that I can tell at all, sometimes it hasn't even snowed.

So if there's any doubt at all, call the 800 number and find out whether or not we're having court that day. If you have an issue, if you have a flat tire, the T breaks down, things happen, just call us. Don't simply disappear, try to let us know, and we can deal with it. We have four alternates, so we can deal with all kinds of situations that might arise if we have to let someone go, but please call.

All right. Just a couple other things. Again, what 01:18PM we're going to do Monday at 9:00 will be first we'll start with the opening statements. The government in its opening will tell you about the evidence that it expects to introduce. The opening is, of course, not evidence, it's to help you understand the evidence. The defense, if it chooses, may open at the same time. We'll then hear from the government. It

will call its witnesses and introduce its exhibits. Obviously, both sides can cross-examine each other's witnesses.

The defendant after the government rests may present evidence if he chooses. Again, he's not required to do so. He does not have to prove his innocence, he does not have to testify or put on any evidence at all.

At the end of the trial, both sides will be given times for closing arguments. Again, those are not evidence, and then you'll get my instructions, again, which will be both

01:19PM orally and in writing, and then you'll leave the courtroom to deliberate and render your verdict. You will never have to reveal your deliberations or explain your verdict to anyone.

All right. I have one last instruction. Under our Constitution and our system of laws, all persons are equal before the law. Everyone accused of a crime is entitled to a fair trial. You should not hesitate to acquit if you believe that the government has met its burden of proof, you should not hesitate to acquit if you think it has not, but you must be completely scrupulously, open-minded, honest and fair. That is

01:20PM your duty as jurors and as citizens of the United States.

So, thank you again for your patience, for your willingness to serve, and I am truly thankful that we still have citizens willing to discharge their obligations and their duties.

Ms. Pezzarossi will show you where you're to meet on

Monday, and otherwise I will see you Monday morning at 9:00. Thank you. Have a good weekend, all.

THE CLERK: All rise for the jury.

(JURORS EXITED THE COURTROOM.)

THE COURT: All right. First, on today's motion in limine concerning the photographs, my ruling is going to be this. I'm going to admit the two photographs taken from a distance. The photograph of the body in the river, I'm going to exclude under Rule 403. I think it's a very close call, and like any other issue, it, of course, is subject to revision if a particular window is opened, but I think I'm in the exercise of prudence going to exclude that.

I will make sure by Monday morning that we're all on the same page in terms of who are the 12 jurors and who are the four alternates. Again, you will know, but they will not until the trial is over or until the evidence is over.

Is there anything else we need to take up before Monday? And I think we ought to convene at 8:30 on Monday morning just to see if there's anything. Mr. Garland.

MR. GARLAND: Yes, your Honor, I believe that the motion in limine this morning also included or asked to exclude testimony that Dr. Zachariah would do about any events that occurred outside of Butare and the hospital.

THE COURT: Okay. All right. Based on if he's testified in other trials, I mean, I'd be willing to point to

something specific, but I think as a general matter, I'm going to permit it with the understanding that the purpose of this testimony and the scope of the testimony is going to be to essentially set a context, and, if necessary, I'll give a cautionary instruction.

The jury may have some difficulty particularly at the beginning with place names and so forth, but to make clear that he is describing events as to which there is no evidence that the defendant is present.

01:23PM MR. GARLAND: Your Honor, if I can just inquire, you've excluded the photograph from the river, but I don't understand the Court's ruling to mean we can't have testimony about that?

THE COURT: Correct.

MR. GARLAND: Okay. Thank you.

MR. LAUER: And I assume, your Honor, that you'll be asking me to the extent that I may have objections depending on the length and detail of Dr. Zachariah's testimony to object contemporaneously.

01:24PM THE COURT: Well, it's a little abstract. Yes. Ideally, if he's testified in the past at other similar trials, and, you know, or you expect he's going say X and you have a particular trouble with X as opposed to the more general scope of it, I'd rather see it either before the trial, you know, before we get into it, I'll obviously leave you that option.

It occurs to me or it occurs to me when I'm reading the names, it might be a very useful exercise for every witness for the government or both sides to have some of the African names spelled out, maybe even an easel that has nothing on it but those person's names or something on the document camera, you know, I think it will help everyone, including me, never mind the jurors, you know, keep track of things.

It's hard enough in any trial involving a lot of witnesses, but, again, with the unfamiliar language, I think 01:25PM that would be a useful exercise, but I'll leave it up to you as a suggestion, obviously, not an instruction.

Anything else?

MR. VARGHESE: Your Honor, just one quick question about the Court's practice. Some sessions, when we have an expert on, the Court would like us to actually formally move to admit the expert.

THE COURT: I don't want you to do that.

MR. VARGHESE: Okay.

THE COURT: If you do that, I'll say something cryptic 01:25PM so the jury doesn't hear me calling that person an expert, like I will permit Rule 702 testimony or something like that, but, you know, if there's an objection as to qualifications or the opinion or whatever, we'll hear it at sidebar, and otherwise if there's no objections, you know, you ask what the person's qualifications are, what they did to become familiar with the

subject matter, do you have an opinion, yes, I have an opinion, what is the opinion, please tell us the basis of your opinion. That's the way a medical or scientific expert. The choreography may be a little different --

MR. VARGHESE: Yes, your Honor.

THE COURT: With a historian, but that's the thrust of it.

MR. VARGHESE: Thank you, your Honor.

THE COURT: Mr. Lauer, anything else?

01:26PM MR. LAUER: Nothing else from us, thank you.

THE COURT: I will see you all 8:30 Monday morning. Have a good weekend, all.

(Whereupon, the hearing was adjourned at 1:26 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I do hereby certify that the foregoing transcript, Pages 1 through 145 inclusive, was recorded by me stenographically at the time and place aforesaid in Criminal Action No. 17-10292-FDS, UNITED STATES of AMERICA vs. JEAN LEONARD TEGANYA and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 21st day of August, 2019.

s/s Valerie A. O'Hara

_________________________

VALERIE A. O'HARA
OFFICIAL COURT REPORTER